UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS J. JACKSON, III et al., | Case No. 2:25-cv-03623-HDV-RAO |
| Plaintiffs, | **ORDER DENYING PRELIMINARY INJUNCTION [22]** |
| v. | |
| RYAN KAVANAUGH et al., | |
| Defendants. | |

## I.   INTRODUCTION

This case arises from *Skill House*, a horror film set for release on July 11, 2025.  Curtis J. Jackson III (professionally known as "50 Cent") appears for just over two minutes in the film, but is featured prominently as a producer in the film's marketing.

Jackson and his company NYC Vibe, LLC (collectively "Plaintiffs") now allege that *Skill House*, its production company, and its producer (collectively "Defendants"), used his name and likeness without his consent.  He seeks to enjoin the film's release and Defendants' use of his name, image, voice, trademarks, and other intellectual property to promote the film, contending that he risks irreparable harm to his brand and reputation ("Motion").  [Dkt. No. 22].  Defendants cannot produce a signed copy of the parties' agreement, but contend that the parties nevertheless reached an agreement in which Jackson would promote the film in exchange for a profit share.

As discussed in the Court's July 3, 2025 Minute Order [Dkt. No. 36], Plaintiffs' Motion is denied.  Even assuming *arguendo* that the parties' agreement was never executed, Defendants produce evidence in the record suggesting mutual assent as to the agreement's material terms. Accordingly, Plaintiffs fail to show a likelihood of success on the merits.

## II.   BACKGROUND[1]

In the summer of 2022, Curtis Jackson III and Ryan Kavanaugh entered into discussions around Jackson's involvement in *Skill House*.  Kavanaugh, a film producer, is the founder of Skill House Movie, LLC and co-founder of GenTV, LLC ("GenTV"), a production company. Declaration of Ryan Kavanaugh ("Kavanaugh Decl.") ¶¶ 2–5 [Dkt. No. 26-5].  *Skill House* is slated to be GenTV's first feature film.  *Id.* ¶ 6.

---

[1] Defendants raise evidentiary objections to Plaintiffs' declarations submitted in support of their Reply.  [Dkt. No. 30].  Defendants primarily object that these declarations were not provided to Defendants in Plaintiffs' moving papers.  In light of the relaxed evidentiary standard for preliminary injunction proceedings, the Court need not rule on admissibility.  *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.").  However, where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court overrules the objection.

On June 26, 2022, Stephen Savva, Jackson's outside general counsel, sent Neil Sacker, production counsel for the *Skill House* film, an email averring that they were "good to go" on the following terms: a producer credit, ten percent backend profit participation, Jackson's "reasonable social media marketing and promotional support" with prior written approval, actor and producer participation in any sequels, product placement of Jackson's cognac and champagne brands, and Jackson's participation in a scene.  Declaration of Neil Sacker ("Sacker Decl.") ¶ 4, Ex. 2 [Dkt. No. 26-4]; *id.* ¶ 5, Ex. 3 (Savva replying to Sacker clarifying that Skill House Movie "would have the right to use his name and likeness in the marketing and publicity of the Picture"); Kavanaugh Decl. ¶ 12, Ex. 1 at 2 (Savva texting that Jackson's team "good to go" on the above terms).  Kavanaugh confirmed the following day that he would be able to provide Jackson with ten percent backend profit, as Savva's terms provided.  *Id.* ¶ 13, Ex. 1 at 3–4.  *See also id.* ¶ 17, Ex. 1 at 6 (Kavanaugh confirming with Savva that Jackson would be in the main credits and that Skill House Movie could "use him to market the movie").

On July 2, 2022, Sacker sent Savva a Binding Term Sheet and Certificate of Employment (collectively the "Final Agreement").  Sacker Decl. ¶ 6, Ex. 4.  The parties exchanged revisions.  *Id.* ¶¶ 7–14, Exs. 5–12.  On July 30, 2022, Sacker sent copies of the "final version" of the parties' agreement.  *Id.* ¶ 15, Ex. 13 (unsigned Final Agreement).  The Final Agreement included the parties' previously agreed terms.  *Id.*  In addition, the Final Agreement provided Jackson fixed compensation in the amount of $100,000 and potential bonuses and clarified Jackson's role in marketing.  *Id.* at §§ 5, 7 (providing that Skill House Movie, LLC "shall have the right to utilize [Jackson's] name, voice, approved likeness and approved biographical information in connection with the marketing and publicity," with Jackson retaining the right to approve all marketing and publicity materials).  The Final Agreement also incorporated a Certificate of Employment providing that Jackson may not seek "injunctive or other equitable relief" and that "[a]ny and all controversies, claims or disputes arising out of or relating to this agreement" are subject to arbitration.  *Id.* at Ex. A.

However, neither party proffers a signed copy of the Final Agreement.  Kavanaugh avers that when Jackson was on set filming his scenes on August 2, 2022, he signed the agreement in a green room in the presence of Kavanaugh, Savva, producer Bradley Baskin, and "another person who

3

1    [Kavanaugh] believe[s] was from Mr. Savva's office."  Kavanugh Decl. ¶¶ 31–34.  *See also*

2    Declaration of Bradley Baskin ("Baskin Decl.") ¶¶ 9–12 [Dkt. No. 26-1].  Jackson, his counsel, and

3    his agent deny that any final agreement was ever signed.  Declaration of Curtis J. Jackson ("Jackson

4    Decl.") ¶ 9 [Dkt. No. 22-1]; Supplemental Declaration of Stephen J. Savva ("Supplemental Savva

5    Decl.") ¶¶ 6–8 [Dkt. No. 29-3]; Declaration of Tommy Finkelstein ("Finkelstein Decl.") ¶ 4 [Dkt.

6    No. 29-4].

7            On or about August 6, 2022, Jackson's team requested a change to the terms relating to

8    Jackson's payment.  Kavanaugh Decl. ¶ 38, Ex. 1 at 41–42, 47–48.  After further negotiations, on

9    August 11, 2022, Sacker sent a "further revised Binding Term Sheet" that he believed "incorporates

10   the final agreed upon terms."  Finkelstein Decl. ¶ 9, Ex. B.  The revised term sheet contains revisions

11   only to the provisions pertaining to Jackson's compensation.  *Id.* at 11.  On September 2, 2022, in

12   response to Sacker's request that Jackson sign the revised agreement, Finkelstein responded that they

13   "need to discuss the certificate."  *Id.* ¶ 11, Ex. C.  Kavanaugh acknowledges that this revised term

14   sheet was never signed.  Kavanaugh Decl. ¶ 40.

15           Despite this, the parties continued to work together to promote the film.  On August 15,

16   2022, Jackson commented positively about a clip of the film.  Kavanaugh Decl. ¶ 43, Ex. 7 at 2.  On

17   November 16, 2022, Jackson and Kavanaugh discussed the placement of his alcohol throughout the

18   film.  *Id.* ¶ 44, Ex. 7 at 6–7.  In January 2023, Kavanaugh and Savva discussed the timing of the

19   film's release.  *Id.* ¶¶ 51–52, Ex. 1 at 51–54.  In April 2023, Kavanaugh, Savva, and Jackson's

20   publicist Amanda Ruisi discussed Jackson's appearance in a Behind the Scenes reel.  *Id.* ¶ 54, Ex. 5

21   at 14–25.  In January 2024, Kavanaugh updated Ruisi about *Skill House*'s anticipated premiere date.

22   *Id.* ¶ 56, Ex. 10 at 1–2.  On July 22, 2024, Kavanaugh texted Savva about the release of the first

23   eight minutes of the film.  *Id.* ¶ 60, Ex. 1 at 59–61.  On July 28, 2024, Kavanaugh exchanged

24   messages with Jackson's agent Jim Osborne about how they could get press about the preview

25   receiving one million views.  *Id.* ¶ 63, Ex. 4 at 4–9.

26           By August 2024, the parties' relationship deteriorated, as Jackson's team objected to a

27   headline suggesting that Jackson owned GenTV.  *Id.* ¶ 66, Ex. 11 at 1–18.  At the same time,

28   Jackson's team began to raise questions about whether the contract had ever been signed.  *Id.* ¶ 68,

Ex. 4 at 10–12; *id.* ¶ 76, Ex. 11 at 27–28, 30–32.  Jackson's counsel also noted that they had no

record of payment.  *Id.* ¶¶ 78–79, Ex. 11 at 27–33.[2]

On April 24, 2025, Jackson initiated the instant action for: (1) federal trademark

infringement, 15 U.S.C. § 1114; (2) false advertising and unfair competition, *id.* § 1125(a); (3)

violation of common law right of publicity, (4) violation of state statutory right of publicity, Cal.

Civ. Code § 3344; (5) violation of the state Unfair Competition Law, Cal. Bus. & Prof. Code

§§ 17200 *et seq.*; (6) violation of the state false advertising law, *id.* § 17500; (7) state common law

trademark infringement, and (8) state common law unfair competition.  Complaint ¶¶ 56–110 [Dkt.

No. 1].

On June 2, 2025, Jackson moved for a injunction preventing the release of the *Skill House*

film.  The Court heard oral argument on the matter on July 3, 2025 and took the matter under

submission.  [Dkt. No. 37].  On the same day, the Court issued a minute order denying Plaintiff's

request, finding that Plaintiff has not shown a likelihood of success on his claims.  [Dkt. No. 36].

The Court elaborates on its decision below.

## III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may be awarded only if the

plaintiff clearly shows entitlement to such relief."  *Am. Bev. Ass'n v. City and County of San

Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008)).  To prevail on a motion for a preliminary injunction, the movant must

establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent

the preliminary injunction, (3) the balance of equities tips in its favor, and (4) a preliminary

injunction is in the public interest.  *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).

In the Ninth Circuit, a party seeking injunctive relief may alternatively show: (1) that there are

---

[2] Kavanaugh avers that he reissued checks to Jackson for he and his son's Screen Actors Guild daily rates and for the $100,000 marketing payment on April 5, 2025.  Kavanaugh Decl. ¶ 83, Ex. 6 (checks dated June 3, 2025).  Jackson's counsel confirms that they received two checks for the sum of $703 each on April 28, 2025, but that they were unsigned.  Declaration of Jonathan Loeb ¶¶ 5–7 [Dkt. No. 22-2].  On June 12, 2025, three checks were delivered to Jackson's agent, in the amount of $703, $703, and $100,000 respectively.  Finkelstein Decl. ¶ 12.

1   "serious questions going to the merits," (2) a likelihood of suffering irreparable harm in the absence

2   of preliminary relief, (3) that the balance of hardships "tips sharply" in favor of the moving party,

3   and (4) the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

4   1131–32 (9th Cir. 2011) (citation omitted).

5          Preliminary injunctions are denied unless the movant can make a "'clear showing' of

6   evidence" that supports each of the preliminary injunction factors. *J.L. Boyd v. Luna,*

7   No. 2:24-cv-05716-SPG-AJR, 2024 WL 4799125, at *2 (C.D. Cal. Oct. 21, 2024) (quoting *Winter*,

8   555 U.S. at 22). Where the parties "fundamentally disagree on the facts underlying the case, courts

9   routinely deny requests for preliminary injunctions." *Id.* (internal quotation marks omitted).

10  **IV.   DISCUSSION**

11         Plaintiffs contend that they show a likelihood of success on the merits, that Jackson will

12  suffer irreparable harm from the release of *Skill House*, that the balance of hardships tips sharply in

13  his favor, and that an injunction is in the public interest. Motion at 1–2. For the reasons discussed

14  below, the Court disagrees.

15         **A.    Availability of Injunctive Relief**

16         As an initial matter, Defendants contend that the Agreement bars injunctive relief. *See*

17  Sacker Decl. ¶ 15, Ex. 13, Ex. A ("In no event shall [Jackson] seek or be entitled to rescission,

18  injunctive or other equitable relief."). But neither party can produce an executed copy of the Final

19  Agreement. Kavanaugh Decl. ¶ 104 (noting that he has thus far been unsuccessful in locating copies

20  of the executed Agreement); Sacker Decl. ¶ 18 (averring that despite a diligent search, he has not

21  located a copy of the executed Agreement). Defendants do not show that Jackson otherwise

22  manifested assent to the provision prohibiting injunctive relief. [3] On this record, the Court cannot

23  find that the Final Agreement bars injunctive relief.

24  _____

25  [3] Defendants also argue that Jackson's own counsel admitted that the Certificate of Employment was
    signed. Opposition at 18 (citing Kavanaugh Decl. ¶¶ 79–80, Ex. 11 at 30). But Savva merely noted
26  that his "*suspicion* [was] that the certificates may have been signed but the agreement was still
    pending." Kavanaugh Decl. ¶¶ 79–80, Ex. 11 at 30. Savva later added that he believed the term
27  sheet had not been signed as of September 2, 2022. *Id.*, Ex. 11 at 33.

28

1    Defendants also argue that the Court may not grant injunctive relief as Jackson's claim is

2    subject to arbitration.  Because the Court declines to find at this stage that the Final Agreement was

3    executed, the Court does not analyze arbitrability.[4]  Accordingly, the Court proceeds to consider the

4    whether Plaintiffs are entitled to an injunction.

5    **B.    *Winter* Factors**

6    Plaintiffs contend that they are likely to succeed on their claims for federal and state

7    trademark infringement, false advertising, unfair competition, and right of publicity.  Motion at 9–

8    17.  But each of Plaintiffs' claims fails if Jackson did indeed agree to appear in and promote the *Skill*

9    *House* film.[5]

10    In evaluating a motion for a preliminary injunction, the Court may weigh the parties'

11    pleadings, declarations, and exhibits in support of and in opposition to the motion.  *See Republic of*

12    *the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).  However, courts routinely deny

13    injunctions where the parties "fundamentally disagree on the facts underlying the case[.]"  *J.L. Boyd*,

14    2024 WL 4799125, at *2 (quoting *Teddy's Red Tacos Corp. v. Vazquez*, No. CV-19-03432-RSWL-

15    AS, 2019 WL 6895983, at *3 (C.D. Cal. Oct. 10, 2019)) (citation omitted).  Here, the parties submit

16    competing declarations disputing the central question in this case: whether the Final Agreement was

17    executed.  *Compare* Kavanugh Decl. ¶¶ 31–34 and Baskin Decl. ¶¶ 9–12 [Dkt. No. 26-1] *with*

18    Jackson Decl. ¶ 9, Supplemental Savva Decl. ¶¶ 6–8, and Finkelstein Decl. ¶ 4.  This alone can

19    justify denial.

20

21    —————————————

22    [4] Even if the claim is subject to arbitration, courts may issue injunctive relief on arbitrable claims, if

23    "necessary to preserve the status quo and the meaningfulness of the arbitration process[.]"  *Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am. Inc.*, 609 F.3d 975, 981 (9th Cir. 2010).

24    [5] *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (citing *Prestonettes, Inc. v.*

25    *Coty*, 264 U.S. 359, 368 (1924)) (". . . trademark infringement law prevents only unauthorized uses . . ."); *Apogee v. Sugarfina, Inc.*, CV 18-1562-RSWL-Ex, 2021 WL 4819715, at *6 (C.D. Cal.

26    Oct. 15, 2021) (internal quotation marks and citation omitted) ("[F]ederal and state laws regarding trademarks and related claim of unfair competition are substantially congruent."); Cal. Civil Code

27    § 3344 (prohibiting infringement on a plaintiff's right of publicity "without such person's prior consent"); *Ross v. Roberts*, 222 Cal. App. 4th 677, 684 (2013) (holding that the common law right of

28    publicity requires "the defendant's unauthorized use of the plaintiff's identity").

1         Defendants contend that—even assuming that no final agreement was ever executed—the

2    parties reached mutual assent as to Jackson's appearance in the film and the use of Jackson's name

3    and image in marketing.  Opposition at 22–24.  Savva circulated agreed-upon terms on or about June

4    26, 2022.  Sacker Decl. ¶ 4, Ex. 2; Kavanaugh Decl. ¶ 12, Ex. 1 at 2.  After confirming that

5    Jackson's payment was acceptable, Defendants then circulated a binding term sheet, with the same

6    material terms.  Sacker Decl. ¶ 6, Ex. 4.  These communications evince the parties' intent to be

7    bound by the June 26 terms.  *J.B.B. Inv. Partners Ltd. v. Fair*, 37 Cal. App. 5th 1, 12 (2019), *as*

8    *modified* (July 1, 2019) (holding that the plaintiffs' "plan[] to follow up with a formal written

9    agreement . . . does not render the earlier agreement invalid, given the parties' [email]

10   communications . . . demonstrated their intent to be bound by the terms of the [earlier] offer"); *Blix*

11   *Street Records, Inc. v. Cassidy*, 191 Cal. App. 4th 39, 48 (2010) ("When parties intend that an

12   agreement be binding, the fact that a more formal agreement must be prepared and executed does not

13   alter the validity of the agreement[.]").

14        The parties' conduct also suggests a meeting of the minds.  *Merced County Sheriff's*

15   *Employees' Ass'n v. County of Merced*, 188 Cal. App. 3d 662, 670 (1987) (citation omitted) ("The

16   manifestation of assent to a contractual provision may be 'wholly or partly by written or spoken

17   words or by other acts or by failure to act.'").  Jackson arrived on set to film his scenes and

18   promotional content, as the parties had envisioned since at least June 26, 2022.  In the months that

19   followed, the parties worked together to promote the film, with Jackson's publicist approving and

20   disapproving proposed media coverage as the parties contemplated.  *See, e.g.*, Kavanaugh Decl.

21   ¶ 43, Ex. 7 at 2; *id.* ¶ 51–52, Ex. 1 at 51–54; *id.* ¶ 54, Ex. 5 at 14–25; *id.* ¶ 56, Ex. 10 at 1–2; *id.* ¶ 60,

22   Ex. 1 at 59–61; *id.* ¶ 63, Ex. 4 at 4–9.[6]  Indeed, when the parties first discovered that they could not

23   locate the executed agreements, Savva proposed "properly finaliz[ing] the paperwork," suggesting

24   that the parties viewed the Final Agreement as a formality memorializing their existing agreement.

---

26   [6] The condition precedent requiring receipt of an executed contract is not dispositive.  Sacker ¶ 15,

27   Ex. 13.  Where both parties proceeded to perform under an agreement, a condition precedent
requiring signatures is waived.  *Gonzalez v. Oplaai LLC*, No. 2:23-CV-06192-SB-E, 2023 WL

28   11195911, at *4 (C.D. Cal. Dec. 19, 2023).

1   Kavanaugh Decl. ¶ 76, Ex. 11 at 32 ("If they don't have [the signed Certificates], we will can [sic]

2   just put new ones together and get them signed.").  Nor do later modifications preclude a meeting of

3   the minds on the central terms.  *See* Finkelstein Decl. ¶ 9, Ex. B.

4           Based on the record before the Court suggesting that Jackson consented to the use of his

5   name and image in connection with the film, Plaintiffs have failed to carry their burden of

6   establishing a likelihood of success—or even serious questions—on the merits.[7]

7   **V.     CONCLUSION**

8           Plaintiffs' Motion is denied.

9

10   Dated: July 11, 2025

11                                                    Hernán D. Vera
                                                     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [7] Because Plaintiffs have failed to establish a likelihood of success, the Court does not assess the

28   other *Winter* factors.