UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS JACKSON III et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN KAVANAUGH et al.,<br><br>Defendants. | Case No. 2:25-cv-03623-HDV-RAO<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION [27]** |

1

## I.   INTRODUCTION

Curtis Jackson III (professionally known as "50 Cent") appeared in the recent horror film *Skill House*. Jackson and his company NYC Vibe, LLC (collectively "Plaintiffs") dispute that they and Skill House Movie LLC, its production company, and its producer (collectively "Defendants") ever reached a binding contract providing for Jackson's participation in the film.

Defendants now move to compel arbitration ("Motion"), contending that the parties executed a contract including an arbitration agreement and that, in the alternative, the parties' conduct evinced an agreement to arbitrate. [Dkt. 27]. The Court disagrees. Based on the available evidence, Defendants have not satisfied their burden to prove that the parties agreed to arbitrate.

## II.   BACKGROUND

### A.   Factual Background

In the summer of 2022, Curtis Jackson III and Ryan Kavanaugh entered into discussions around Jackson's involvement in *Skill House*. Kavanaugh, a film producer and financier, is the founder of Skill House Movie, LLC and co-founder of GenTV, LLC ("GenTV"), the production company behind *Skill House*. Declaration of Ryan Kavanaugh ("Kavanaugh Decl.") ¶¶ 2–6 [Dkt. 27-5].

After negotiations, the parties produced two documents: the Binding Term Sheet and the Certificate of Employment (collectively the "Agreement"). Declaration of Neil Sacker ("Sacker Decl.") ¶ 15, Ex. 13 [Dkt. 27-4] (unsigned Agreement). The Binding Term Sheet lists the material terms of the parties' agreement and provides:

> Condition Precedent: SHM's receipt of a copy of this Binding Term Sheet executed by [Jackson] including an executed copy of the Certificate of Employment, attached hereto as Exhibit "A" and incorporated herein by reference.

*Id.* at 113. The Certificate of Employment provided that "[a]ny and all controversies, claims or disputes arising out of or related to this agreement" are subject to arbitration. *Id.* at 120.

To date, neither party has produced a signed copy of the Agreement. Defendants contend that Jackson signed the Agreement on August 2, 2022 while on set to film scenes and promotional material. Kavanaugh Decl. ¶¶ 31–34 (noting that he, Jackson, producer Bradley Baskin, Jackson's

1  counsel Stephen Savva, and "another person who [Kavanaugh] believe[s] was from Mr. Saava's
2  office" were present); Declaration of Bradley Baskin ("Baskin Decl.") ¶¶ 9–10 [Dkt. 27-1] (averring
3  that he witnessed Jackson's signature); Declaration of Bryce Hall ("Hall Decl.") [Dkt. 27-2] ¶¶ 9–10
4  (averring that he overheard the conversation about Jackson's signature and that those in the room
5  "announced that the documents were complete and everything was official").

6        Plaintiffs deny that either document was signed on August 2 (or any other date). Declaration
7  of Curtis J. Jackson, III ("Jackson Decl.") ¶¶ 4–5, 7 [Dkt. 40-1] (averring that he never signed the
8  Agreement on August 2 or any other date); Declaration of Stephen J. Savva ("Savva Decl.") ¶¶ 4, 6–
9  7 [Dkt. 40-2] (testifying that he did not witness Jackson sign the Agreement on August 2 or any
10 other date and that no one else from his firm would have been present on set on August 2);
11 Declaration of Tommy Finkelstein ("Finkelstein Decl.") ¶¶ 4–5 [Dkt. 40-3] (stating that, to the
12 extent Defendants allege that he was the unnamed participant, he was not present on set on August 2
13 and did not witness Jackson sign the Agreement); Declaration of Jim Osborne ("Osborne Decl.")
14 ¶¶ 4–6 [Dkt. 40-4] (averring that he had never seen a signed copy of the Agreement and did not
15 know if a signed agreement ever existed); Declaration of Kyle Loftus ("Loftus Decl.") ¶¶ 3–5
16 [Dkt. 40-5] (stating that to the extent Defendants allege that he was the unnamed participant, he did
17 not witness Jackson sign the Agreement and has never seen a signed copy); Declaration of Matthew
18 Stein ("Stein Decl.") ¶¶ 3–5 [Dkt. 40-6] (same).

19       Soon thereafter, Jackson sought to secure a larger share of the film's profits. On August 11,
20 2022, Sacker sent a revised Term Sheet and Certificate, including redlined changes to the Fixed
21 Compensation provision, noting that he believes the attached Agreement now "incorporates the final
22 agreed upon terms" and requesting Jackson's signature on both the modified Binding Term Sheet
23 and the Certificate of Employment. Finkelstein Decl. ¶ 9, Ex. B. Sacker repeatedly sought
24 Jackson's signature in the following weeks. *Id.* ¶ 11, Ex. C. Savva and Tommy Finkelstein (in-
25 house counsel at Independent Artist Group, which serves as Jackson's agents) aver that they had
26 concerns about the language of the Binding Term Sheet and Certificate of Employment. Savva
27 Decl. ¶ 4; Finkelstein Decl. ¶¶ 1, 11 (noting that he discussed his concerns with Savva following the
28 receipt of Sacker's September 2, 2022 email). That same day, Finkelstein replied to Sacker, "Neil,

3

1   WE need to discuss the certificate." *Id.* ¶ 11, Ex. C.  Defendants do not dispute that *this* version of
2   the Agreement was never signed.  Motion at 24.
3     In the months that followed, the parties collaborated to promote the film.  In doing so, the
4   parties repeatedly referenced the Agreement.  *See, e.g.*, Kavanaugh Decl. ¶ 73, Ex. 12 at 1 (Savva's
5   April 1, 2025 message noting that "[o]ur agreement requires all new press to be approved in advance
6   by Amanda before it goes out"); *id.* ¶ 67, Ex. 11 at 12 (expressing doubt as to whether a dispute over
7   the use of Jackson's name in media coverage "[would] be covered by that arbitration clause"); *id.*
8   ¶ 67, Ex. 11 at 16 (Jackson's PR representative, Amanda Ruisi, suggesting that the group "pull the
9   agreement just to be sure"); *id.* ¶ 79, Ex. 11 at 30 (Savva averring that his "suspicion is that the
10  certificates may have been signed but the agreement was still pending").
11    As early as August 2024, the parties realized that they were unable to locate the signed
12  agreements.  *See e.g.*, *id.* ¶ 68, Ex. 4 at 12 (August 16, 2024 text from Osborne noting that Sacker
13  does not have a signed Agreement); *id.* ¶ 74, Ex. 4 at 39 (April 2, 2025 text from Osborne asking if
14  Kavanaugh has the signed Agreement); *id.* ¶ 78, Ex. 11 at 27 ("I've searched everywhere and can't
15  find [the signed agreements]."); *id.* ¶ 104 ("Currently, I am expending vast resources to attempt to
16  locate the relevant documents but have thus far been unsuccessful.").
17    **B.    Procedural Background**
18    On April 24, 2025, Jackson initiated the instant action for: (1) federal trademark
19  infringement, 15 U.S.C. § 1114; (2) false advertising and unfair competition, *id.* § 1125(a);
20  (3) violation of common law right of publicity, (4) violation of state statutory right of publicity, Cal.
21  Civ. Code § 3344; (5) violation of the state Unfair Competition Law, Cal. Bus. & Prof. Code
22  §§ 17200 *et seq.*; (6) violation of the state false advertising law, *id.* § 17500; (7) state common law
23  trademark infringement, and (8) state common law unfair competition.  Complaint ¶¶ 56–110
24  [Dkt. 1].  Plaintiffs sought a preliminary injunction enjoining the release of *Skill House*, which the
25  Court denied.  [Dkt. 36, 41].  In the Court's Order denying Plaintiffs' request for a preliminary
26  injunction, the Court noted that the parties' course of conduct suggested mutual agreement as to the
27  material terms of the Agreement ("PI Order").  [Dkt. 41].
28

On June 12, 2025, Defendants moved to compel arbitration, contending that the parties were bound by the Certificate of Employment. The Court heard oral argument on the instant Motion on July 31, 2025 and took the matter under submission. [Dkt. 48].

### III.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") "governs arbitration agreements in contracts evincing 'a transaction involving commerce.'" *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1201 (9th Cir. 2021) (quoting 9 U.S.C. § 2). It "declares 'a liberal federal policy favoring arbitration' and provides that such agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id*. (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) and 9 U.S.C. § 2).

The FAA allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. A district court's role is "limited to 'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "If the answer to both questions is yes, then the FAA requires a court 'to enforce the arbitration agreement in accordance with its terms.'" *Id.* (quoting *Chiron Corp.*, 207 F.3d at 1130).

Pursuant to Section 2 of the FAA, there are two types of challenges to arbitration agreements: "One type challenges specifically the validity of the agreement to arbitrate, and the other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2010)). If a party challenges the validity of the arbitration agreement under Section 2, then the court "must consider the challenge before ordering compliance with that agreement." *Id*. at 71.

5

## IV. DISCUSSION

The parties do not dispute that the Certificate of Employment—if applicable—requires Jackson to arbitrate his dispute. Motion at 19; Opposition at 18.[1] Rather, the parties dispute whether the parties assented to the Certificate *at all*.[2]

The party seeking to compel arbitration must "prove the existence of a valid [arbitration] agreement by a preponderance of the evidence." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019). "In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under California law, a contract exists if: (1) parties capable of contracting; (2) consent (3) as to a lawful object, with (4) sufficient cause or consideration. *See* Cal. Civ. Code § 1550. Here, only consent is at issue.

Defendants first contend that their failure to produce an executed copy of the Agreement is of no moment. Motion at 21–23. Courts may consider secondary evidence of a writing so long as the proponent of the writing did not act in bad faith. Fed. R. Evid. 1002, 1004(a) (providing an exception to the presumption that "[a]n original writing . . . is required in order to prove its content," when "all the originals are lost or destroyed, and not by the proponent acting in bad faith."); *Dart Indus., Inc. v. Com. Union Ins. Co.*, 28 Cal 4th 1059, 1068 (2002). But the proponent bears the burden of proving that it is "more probable than not that the originals . . . were lost or destroyed without bad faith." *Keshe v. CVS Pharmacy Inc.*, No. 2:14-CV-08418-CAS-MANX, 2016 WL

---

[1] Plaintiffs do contend that even if Jackson assented to the Certificate, the Court must still decide whether non-signatories NYC Vibe, Kavanaugh, and GenTV are bound by it. Motion at 18–21. Because the Court does not find that Jackson assented to arbitration, it need not address this issue.

[2] Though an arbitration agreement can delegate issues of validity and arbitrability to the arbitrator, it may not delegate challenges to contract formation. *Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 634–35 (9th Cir. 2021); *id.* at 635 (quoting *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017)) ("Although challenges to the *validity* of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very *existence* of the contract are, in general, properly directed to the court.").

1367702, at *2 n.2 (C.D. Cal. Apr. 5, 2016), *aff'd sub nom. Keshe v. CVS Pharmacy*, 711 F. App'x 396 (9th Cir. 2017) (citation omitted) (finding that the exception did not apply where the proponent "fail[ed] to offer any evidence that the alleged note existed" in the first place). The Court cannot find that it is more probable than not that the signed Agreement existed but was destroyed or lost.

At any rate, the secondary evidence does not establish consent. The parties proffer diametrically opposed accounts. *Compare* Kavanaugh Decl. ¶¶ 31–34; Baskin Decl. ¶¶ 9–10; Hall Decl. ¶¶ 9–10 *with* Jackson Decl. ¶¶ 4–5, 7; Savva Decl. ¶¶ 4, 6–7; Finkelstein Decl. ¶¶ 4–5; Osborne Decl. ¶¶ 4–6; Loftus Decl. ¶¶ 3–5; Stein Decl. ¶¶ 3–5. The record does not decisively support either account. On one hand, nearly three years after Jackson's purported signature, Savva speculated that "the certificates *may* have been signed" and argued, in response to Kavanaugh's reference to an arbitration provision, that an unrelated dispute may not be covered by "that arbitration clause." Kavanaugh Decl. ¶ 79, Ex. 11 at 30 (emphasis added); *id.* ¶ 67, Ex. 11 at 10–12. But Defendants' account is difficult to square with the contemporaneous evidence that the parties remained at odds about the arbitration agreement in September 2022. In the month after Jackson purportedly signed the Agreement, Sacker repeatedly sought Jackson's signature on the parties' revised Agreement. *See, e.g.*, Finkelstein Decl. ¶ 11, Ex. C at 37 ("We really do need the executed agreement."). In September, Finkelstein ultimately replied "WE need to discuss the certificate." *Id.* ¶ 11 (averring that he and Savva had concerns about the Certificate of Emloyment). Though the parties modified the Term Sheet after August 2, 2022, the Certificate remained identical to the draft that Jackson purportedly signed on August 2. *See id.* ¶ 9, Ex. B (reflecting redlines to the Term Sheet, but not to the Certificate of Employment). Had Jackson already executed the Certificate on August 2, his agent presumably would not have expressed concerns over the Certificate a month after the fact.

Defendants' attempt to analogize to cases where employers presented evidence of their general onboarding process is similarly unavailing.[3] The instant situation—where the parties

---

[3] *See Kim v. CashCall, Inc.*, No. SA-CV-17-0076-DOC-DFMX, 2017 WL 8186683, at *3 (C.D. Cal. June 8, 2017) (where the plaintiff "admit[ted] that she 'may have been required to sign an Employee Acknowledgment Form during working hours'"); *Cobble v. 20/20 Commc'ns, Inc.*, No. 2:17-CV-53-

7

negotiated a unique contract for a party who stood to gain one tenth of the film's total profits—is a world away from an onboarding process requiring employees to assent to arbitration as a matter of course. The Court cannot conclude, from the secondary evidence proffered, that Jackson signed the Agreement.

Plaintiffs contend that in the absence of a signed Agreement, no valid contract was ever formed. Motion at 13 (noting that the Term Sheet includes a condition precedent that Skill House Movie receive a signed copy of the Agreement). In its PI Order, the Court reasoned that the condition precedent was not dispositive as to whether the parties reached an agreement on the essential terms of Jackson's participation *at all* because "[w]here both parties proceeded to perform under an agreement, a condition precedent requiring signatures is waived." PI Order at 8 n.6 (citing *Gonzalez v. Oplaai LLC*, No. 2:23-CV-06192-SB-E, 2023 WL 11195911, at *4 (C.D. Cal. Dec. 19, 2023)).

Ultimately, the Court looks to the parties' conduct. The Court (preliminarily) found that the parties' conduct evinced assent as to the material terms of their agreement. *See* PI Order at 8–9. But the parties' performance of the material terms of the agreement does not necessarily evince their assent to arbitrate. *See Banner Ent., Inc. v. Superior Ct.*, 62 Cal. App. 4th 348, 360 (1998), *as modified* (Mar. 30, 1998) (finding that though the parties assented to some terms, "there is *no* evidence of *any agreement*, oral or otherwise, to *arbitrate* any disputes related to whatever oral agreement . . . the parties did make"). The Term Sheet and the Certificate of Employment are two distinct documents. It is possible that the parties executed one, but not the other. It is also possible that the parties assented to the material terms of their agreement without executing either

---

TAV-MCLC, 2018 WL 1026272, at *2 (E.D. Tenn. Feb. 23, 2018) (where defendant produced evidence that "it would have been impossible for any putative plaintiff to have completed the hiring process without executing the Agreements, given the nature of the onboarding software in use at the time"); *Pegasus Int'l Inc. v. Champagne*, No. CIV-6:11-1402, 2012 WL 5616095, at *5 (W.D. La. May 11, 2012), *report and recommendation adopted*, No. CIV-A-6:11-1402, 2012 WL 5818217 (W.D. La. Nov. 15, 2012) (where employees signed offers of employment requiring them to execute the company's arbitration agreement).

8

document—and without assenting to arbitrate. *See* PI Order at 8, 3 (finding that the parties' conduct suggested their intent to be bound by the June 26 terms).

Though the core terms of the parties' agreement—that Skill House Movie would use Jackson's name and image, that Jackson would appear in the film and provide promotional support, and that Jackson would receive a producer credit and backend profit participation—never wavered, the same cannot be said of the arbitration agreement. Finkelstein and Savva expressed apparently newfound concerns about the Certificate of Employment one month *after* their client purportedly signed an identical copy of the Certificate. Finkelstein Decl. ¶ 11, Ex. C. In light of the conflicting evidence, the Court cannot find that Defendants have proven by a preponderance of the evidence that the parties agreed to arbitrate.

## V.  CONCLUSION

Defendants' Motion is denied.

Dated: August 26, 2025

Hernán D. Vera
United States District Judge