1  BLANK ROME LLP
   Jonathan A. Loeb (SBN 162758)
2  jonathan.loeb@blankrome.com
   2029 Century Park East | 6th Floor
3  Los Angeles, CA 90067
   Telephone:  424.239.3400
4  Facsimile:   424.239.3434

5  Craig Weiner (admitted *pro hac vice*)
   craig.weiner@blankrome.com
6  Reena Jain (admitted *pro hac vice*)
   reena.jain@blankrome.com
7  1271 Avenue of the Americas
   New York, NY 10020
8  Telephone:  212.885.5000
   Facsimile:   212.885.5001

9
   Attorneys for Plaintiffs
10 CURTIS J. JACKSON, III, NYC VIBE, LLC, G-UNIT FILM & TELEVISION, INC.

11          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| 13 CURTIS J. JACKSON, III, NYC VIBE, LLC, and G-UNIT FILM & TELEVISION, INC., | Case No. 2:25-cv-03623-HDV-RAO |
| 14 | **SECOND AMENDED COMPLAINT FOR:** |
| 15          Plaintiffs, | **[1] TRADEMARK INFRINGEMENT [15 U.S.C. § 1114]** |
| 16      v. | **[2] FALSE ADVERTISING AND UNFAIR COMPETITION [15 U.S.C. § 1125(a)]** |
| 17 RYAN KAVANAUGH, SKILL HOUSE MOVIE LLC, and GENTV LLC, | **[3] VIOLATION OF COMMON LAW RIGHT OF PUBLICITY** |
| 18          Defendants. | **[4] VIOLATION OF STATUTORY RIGHT OF PUBLICITY [CALIFORNIA CIVIL CODE § 3344]** |
| 19 | **[5] UNFAIR COMPETITION [CAL. BUS. & PROF. CODE § 17200]** |
| 20 | |
| 21 | |
| 22 | **[6] FALSE ADVERTISING [CAL. BUS. & PROF. CODE § 17500]** |
| 23 | **[7] COMMON LAW TRADEMARK INFRINGEMENT** |
| 24 | **[8] COMMON LAW UNFAIR COMPETITION** |
| 25 | **[9] BREACH OF CONTRACT [IN THE ALTERNATIVE]** |
| 26 | **[10] BREACH OF CONTRACT [IN THE ALTERNATIVE]** |
| 27 | **[11] BREACH OF CONTRACT** |
| 28 | **[DEMAND FOR JURY TRIAL]** |

Plaintiffs Curtis J. Jackson, III ("Jackson"), NYC Vibe, LLC ("NYC Vibe"), and G-Unit Film & Television, Inc. ("G-Unit") (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Second Amended Complaint against Defendants Ryan Kavanaugh ("Kavanaugh"), Skill House Movie, LLC ("Skill House Movie"), and GenTV, LLC ("GenTV") (collectively, "Defendants"), hereby allege as follows:

## STATEMENT OF THE CASE

1.     This lawsuit was first commenced on April 24, 2025 and concerns Defendants' brazen and unauthorized use of the name, image, voice, and trademarks of Curtis J. Jackson, III p/k/a "50 Cent" to extensively promote, market, and sell Defendants' film *Skill House* (the "Film") and streaming platform GenTV.

2.     Although Jackson had discussions with Kavanaugh in mid-2022 about acting in and producing the Film, the parties never reached a final agreement. Jackson trusted Kavanaugh—who, despite a series of scandals and bankruptcies, is a well-known name in Hollywood—and provided his acting services on August 2, 2022 with the expectation that the parties would continue to negotiate and, hopefully, reach an agreement.

3.     That trust was misplaced. No agreement was ever reached, let alone signed. Nevertheless, Defendants Kavanaugh, Skill House Movie, and GenTV have billed Jackson as the star and producer of the Film. Defendants have shamelessly and deceptively marketed the Film as "A 50 CENT MOVIE" and "PRODUCED BY 50 CENT," when it is nothing of the sort. They have also prominently featured Jackson's name, image, voice, trademarks, and other intellectual property in the Film itself and in various promotional materials, including on social media. Indeed, Defendants are using "50 CENT" and Jackson's other intellectual property to identify and brand the Film.

4.     Despite publicly labeling Jackson as a producer of the Film, Jackson was given no creative input into the Film. Defendants' counsel claim that Jackson does

1

not have approval rights over the Film itself. Jackson never would have agreed to be associated with a film absent an opportunity to confirm and ensure that it met his high standards; anything less would irreparably damage his carefully curated and award-winning reputation as a film and television producer.

5.    To add insult to injury, Defendants never attempted to pay Jackson a dime in connection with the unauthorized use of Jackson's services and intellectual property in connection with the Film until April 28, 2025—days after this lawsuit had been commenced and years after Jackson provided his acting services for the Film.

6.    To make matters even worse, Defendants have not stopped at misappropriating Jackson's valuable intellectual property for the Film alone: they are also using Jackson's intellectual property and the Film to promote, identify, and brand their new streaming platform, GenTV—a platform which directly competes with Jackson's own streaming channel, 50 Cent Action. In other words, Defendants have not only stolen Jackson's reputation and goodwill amongst his millions of fans to boost their own film, but they have also used that film to unfairly compete with Jackson's other business ventures. Obviously, Jackson never would have agreed to allow his intellectual property rights to be used in such a manner.

7.    Nevertheless, on May 12, 2025, Plaintiffs Jackson and NYC Vibe made a final, non-negotiable settlement offer to Defendants Kavanaugh, Skill House Movie, and GenTV in an attempt to amicably resolve this lawsuit. Later that same day, Defendants unequivocally accepted the settlement offer. Accordingly, Jackson, NYC Vibe, Kavanaugh, Skill House Movie, and GenTV agreed to and entered into an enforceable settlement agreement on May 12, 2025. However, Defendants subsequently breached the material terms of the settlement agreement.

8.    Despite Jackson's repeated objections and demands to cease and desist, as well as this pending lawsuit, Defendants have continued to infringe and misappropriate Jackson's intellectual property rights and released the Film on July 11, 2025.

9.    If anything, Defendants have used this lawsuit to further promote the Film. On July 2, 2025, the night before the hearing on the motion for preliminary injunction, Defendants published a video on Instagram with the following text: "When you make a movie that breaks boundaries and is so damn good, Bryce Hall, Hannah Stocking, writer of SawX, and 50 cent..but 50 pissed he isn't in it more…"[1] On the contrary, Jackson did not agree to be in the Film and was moving to prevent its release. Defendants posted other social media posts using Jackson's name, image, voice, trademarks, and other intellectual property in the days before the Film's release.

10.    Confirming Jackson's concerns about the quality of the Film, the Film was universally panned, with one review stating: "I think a $12 lobotomy would've been more enjoyable than the $12 I spent to go watch this giant pile of sh[**]." And another review stated: "Actively one of the worst things I've ever seen. Barely classifies as a film. Heard 50 Cent was even suing to block the release of this and low key I wish he won!" As of the date of this Second Amended Complaint, the Film has 1.5/5 stars on horror-industry website Bloody Disgusting, 2.3/10 stars on Letterboxd, and 3.1/10 stars on IMDb. The Film had a limited release, and, on information and belief, grossed about $100,000 during its first (if not only) weekend at the box office.

11.    As a direct and proximate result of its poor performance and reviews, the Film has irreparably damaged Jackson's reputation and earning potential in the film and television industry. Indeed, since the Film was released, Jackson has received offers dramatically lower than expected for his acting services.

12.    Due to Defendants' collective blatant and willful infringement, as well as their material breach of the settlement agreement, Plaintiffs have no choice but to continue to litigate this action and file this Second Amended Complaint.

---

[1] *See* https://www.instagram.com/reel/DLoJUymt2UA/ (last visited Dec. 1, 2025).

## Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (trademarks), and 1338(b) (unfair competition) because Plaintiffs Jackson and NYC Vibe's claims arise under the Lanham Act, 15 U.S.C. § 1121 *et seq.*

14.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and, on information and belief, is between citizens of different States.

15.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Kavanaugh because, on information and belief, he is domiciled in the State of California.

17.    This Court has personal jurisdiction over Skill House Movie because, on information and belief, it is registered to do business under the laws of the State of California and maintains its principal place of business in the State of California.

18.    This Court has personal jurisdiction over GenTV because, on information and belief, it is registered to do business under the laws of the State of California and maintains its principal place of business in the State of California.

19.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are subject to personal jurisdiction in this District and a substantial part of the events giving rise to this action occurred in this District.

## Parties

20.    Plaintiff Curtis J. Jackson, III is an individual who is domiciled in the State of Texas. Jackson is a world-famous rapper, actor, producer, entrepreneur, and philanthropist who is professionally known as "50 Cent." Given his extensive and

4

successful career, Jackson's name, image, voice, trademarks, and other intellectual property have substantial commercial value.

21.   Plaintiff NYC Vibe, LLC is a Delaware limited liability company. NYC Vibe is used to hold Jackson's intellectual property, including but not limited to his valuable 50 Cent Marks (defined below).

22.   Plaintiff G-Unit Film & Television, Inc. is a New York corporation. G-Unit is used by Jackson in connection with his film and television endeavors, including for Jackson's acting and producing services.

23.   Defendant Ryan Kavanaugh is a film and television financier and producer. Upon information and belief, Kavanaugh is domiciled in Los Angeles County, California.

24.   The Film was produced by Ryan Kavanaugh in his individual capacity. The poster for the Film states that it is a "A FILM BY RYAN KAVANAUGH" and the Film itself states that it is a "A RYAN KAVANAUGH MOVIE."

25.   Indeed, Kavanaugh, in his individual capacity, had an active role in creating, developing, and promoting the Film. Defendants' counsel filed multiple declarations and hundreds of pages of Kavanaugh's text messages in opposition to the motion for preliminary injunction and in support of the motion to compel arbitration. And as Kavanaugh explicitly stated under the penalty of perjury: "I [Kavanaugh] have personally invested not only my time, but our company also invested considerable money, in the development and production of *Skill House*." Dkts. No. 26-5 ¶ 9; 27-5 ¶ 9.

26.   Moreover, Kavanaugh, in his individual capacity, has the largest ownership share of the Film.

27.   Kavanaugh also stated under the penalty of perjury that he is the founder of both Skill House Movie, LLC and GenTV, LLC. *See* Dkt. Nos. 26-5 ¶¶ 3–4; 27-5 ¶¶ 3–4. Upon information and belief, Kavanaugh owns and controls, whether directly or indirectly, both Skill House Movie and GenTV.

28.    Defendant Skill House Movie, LLC is a Delaware limited liability company and is also registered in California. Upon information and belief, Skill House Movie maintains an office in Los Angeles County, California. Skill House Movie was founded by Kavanaugh and is the corporate vehicle for the Film.

29.    Defendant GenTV, LLC is a Delaware limited liability company and is also registered in California. Upon information and belief, GenTV maintains an office in Los Angeles County, California. GenTV was founded by Kavanaugh and is the production company for the Film. GenTV is also a streaming service and a roughly nine-minute clip from the Film is currently available for free on the platform.[2]

### Facts Common to All Claims for Relief

### Jackson's Valuable Intellectual Property and Brand

30.    Jackson is one of the most recognized and admired artists and entrepreneurs in the world. As a result of his enormous fame, Jackson's name, image, and voice enjoy widespread recognition and his intellectual property commands a high monetary value.

31.    Jackson first rose to fame as a rapper in the early 2000s. In a 2023 *Billboard* article, Jackson was ranked as 17th on their "Top 50 Greatest Rappers of All Time" list.[3] And in a 2024 *Billboard* article, Jackson was named as the second rapper to exceed $100 million in earnings in a tour and the eighth highest-grossing rap act in history.[4] To date, Jackson has sold over 30 million albums worldwide and earned several accolades, including a Grammy Award, a Primetime Emmy Award, thirteen Billboard Music Awards, six World Music Awards, and three American Music Awards.

32.    In addition to a long and award-winning music career, Jackson has created, produced, and directed a number of television shows, films, and

---

[2] *See* https://skillhouse.gentv.com (last visited Dec. 1, 2025).
[3] *See* https://www.billboard.com/lists/best-rappers-all-time/ (last visited Dec. 1, 2025).
[4]  *See*  https://www.billboard.com/music/chart-beat/50-cent-final-lap-tour-grosses-100-million-rap-history-1235684967/ (last visited Dec. 1, 2025).

documentaries, including *Power* and multiple spin-offs on Starz; *For Life* on ABC;
and *Black Mafia Family* on Starz.

33.    Jackson has also forayed into acting in both his and others' projects, and
has starred in well-known films, including *Southpaw*, *Expend4bles*, and *Den of
Thieves*, and popular television shows, including *Power* and *For Life*. A few months
ago (before the release of the Film), it was announced that Jackson has been cast as
the character Balrog in Legendary Entertainment's upcoming live-action *Street
Fighter* film with Jason Momoa, Noah Centineo, country singer Orville Peck, and
WWE superstar Roman Reigns (Joe Anoa'i).

34.    Jackson has continued to expand his film and television empire. For
example, over the past several years he has developed a high-profile partnership with
the city of Shreveport, Louisiana to launch a film and television studio, which will
expand Jackson's production portfolio and provide much-needed employment and
economic development opportunities to the city and surrounding area.

35.    And last year, in 2024, Jackson partnered with entertainment company
Lionsgate to launch a streaming channel called "50 Cent Action," which is available
on The Roku Channel, LG Channels, and other platforms. 50 Cent Action features
premium films and television series hand-selected by Jackson from Lionsgate's
extensive library of tens of thousands of titles, including Jackson's own projects.

36.    Jackson is the owner of the valid and legally protectable mark 50 CENT.
Jackson, through NYC Vibe, has common law rights in the 50 CENT mark and has
registered or applied to register the 50 CENT mark in the United States and across the
world for various goods and services, including but not limited to entertainment
services in the nature of musical performances (U.S. Trademark Registration No.
2,807,302[5]) and the production and distribution of television shows and movies and
entertainment services in the nature of televised and movie appearances (U.S.

---

[5] Registration No. 2,807,302 is incontestable.

Trademark Serial No. 97/155,408[6]) (collectively, the "50 Cent Marks"). True and correct copies of Registration No. 2,807,302 and Serial No. 97/155,408 are attached hereto as Exhibits A and B, respectively.

37.    Moreover, Jackson commands a large following and is extremely active on social media, including Instagram in particular, where he has approximately 35.9 million followers.[7] He also has approximately 42 million followers on Facebook; 12.3 million followers on X (formerly known as Twitter); and 8.4 million followers on TikTok.[8] Jackson uses his social media accounts to promote his various goods and services, including his film and television projects; his streaming channel, 50 Cent Action; and more.

38.    As a result of his immense fame and popularity, Jackson regularly receives lucrative offers to license the use of his name, image, voice, trademarks, and other intellectual property to promote a wide variety of goods and services. In order to maintain the integrity of his brand, Jackson is extremely selective about what goods or services he will agree to endorse. Accordingly, Jackson maintains strict control over the manner in which his name, image, voice, trademarks, and other intellectual property are used and is highly compensated for any such use.

39.    Jackson maintains a similar level of careful control over all his entertainment ventures, including acting and producing opportunities. Although he receives frequent requests to produce or provide acting services in films or television series, Jackson carefully selects the projects on which he agrees to work in order to maintain his carefully curated brand and reputation.

**Negotiations Over the *Skill House* Film**

40.    On or about June 24, 2022, Kavanaugh, in his individual capacity, approached Jackson and his representatives about Jackson potentially acting in and

---

[6] A Notice of Allowance has been issued for Serial No. 97/155,408.

[7] https://www.instagram.com/50cent (last visited Dec. 1, 2025).

[8] https://www.facebook.com/50cent (last visited Dec. 1, 2025); https://x.com/50cent (last visited Dec. 1, 2025); https://www.tiktok.com/@50cent (last visited Dec. 1, 2025).

producing the Film. As a result, Jackson entered into discussions with Kavanaugh for Jackson to potentially act in and produce the Film. However, the parties never reached an agreement, whether express or implied, in connection with the Film.

41. Kavanaugh personally negotiated with Jackson and his counsel regarding the terms in connection with Jackson's services, including compensation, credits, press, and the use of Jackson's name, image, and likeness. In these negotiations, Kavanaugh represented that he would personally allocate—and stated that he did allocate—his own, individual shares of the Film to fund Jackson's compensation and back-end participation, and he paid out of his personal funds for Jackson's travel to the set. Kavanaugh used his primary email account—not a Skill House Movie or GenTV domain—in these negotiations and communications.

42. The parties and their representatives only got as far as negotiating a draft Binding Term Sheet ("Term Sheet") and Certificate of Employment ("Certificate"), but the draft was never finalized, let alone signed. Despite the draft Term Sheet and Certificate requiring the parties' signatures and containing signature blocks for the parties, Jackson never signed the agreement. Upon information and belief, Skill House Movie never signed the draft Term Sheet and Certificate either. And as of the date of this Second Amended Complaint, Defendants have not produced an executed copy of the Term Sheet and Certificate (because one does not exist).

43. Specifically, between June 25 and 27, 2022, Kavanaugh; Neil Sacker, then-production counsel for the Film; and Stephen J. Savva, outside general counsel for Jackson and his entities, exchanged proposed terms by text messages and emails for Jackson to appear in and produce the Film. These communications, whether alone or in conjunction, do not constitute an enforceable agreement because they are missing material terms and a number of proposed terms are open to interpretation, future negotiation, and subsequent events.

44. In particular, on June 26, 2022, Savva sent an email to Kavanaugh, Sacker, and others memorializing proposed terms that had been previously exchanged

9

via text message to, and discussed over the phone with, Kavanaugh directly. Kavanaugh used the email address RK@proxima.media, an email address not affiliated with either Skill House Movie or GenTV.

45.    The June 26, 2022 email contemplated that Jackson would receive 10% back-end profit participation in the Film, which Kavanaugh personally arranged by giving up his own, individual shares of the Film.

46.    After the June 26, 2022 email, the parties continued to exchange additional terms and formal written drafts.

47.    On July 30, 2022, Sacker sent an email to Savva; Tommy Finkelstein, Executive Vice President, General Counsel, and Head of Business Affairs for Independent Artist Group ("IAG") (Jackson's talent agency); and others. The email contained the subject line "Final Version of Curtis Jackson Binding Term Sheet---'Skill House'" and attached redlined and clean copies of the Term Sheet and Certificate. Sacker wrote: "As promised, I've attached a redlined and clean copy of the final version of 50's Binding Term Sheet in connection with 'Skill House'. Please have 50 execute the Binding Term Sheet including the Certificate of Employment and then scan and e-mail back a copy for counter-execution."

48.    The draft Term Sheet and Certificate attached to Sacker's July 30, 2022 email contains the following language at the top of the first page: "**Conditions Precedent:** SHM's [Skill House Movie's] receipt of a copy of this Binding Term Sheet executed by CJ [Curtis Jackson] including an executed copy of the Certificate of Employment, attached hereto as Exhibit 'A' and incorporated herein by reference."

49.    On August 1, 2022, based on his good-faith understanding that the draft Term Sheet and Certificate would continue to be negotiated, finalized, and executed, and to avoid unnecessary delay, Jackson filmed promotional content for the Film.[9]

---

[9] To the extent Defendants even requested Jackson's approval, any approvals that Jackson's press consultant may have purportedly given would have been in connection with the content Jackson filmed on August 1, 2022 and contingent on an agreement being finalized and executed.

And from July 11 to August 20, 2022, based on those same reasons, Jackson posted about the Film on his social media accounts.

50.    On August 2, 2022, based on his good-faith understanding that the draft Term Sheet and Certificate would continue to be negotiated, finalized, and executed, and to avoid unnecessary delay, Jackson filmed scenes for the Film. Jackson's minor son, Sire, also filmed scenes to be used in the Film.

51.    Although Defendants have asserted that Jackson signed the Term Sheet and Certificate on the set of the Film on August 2, 2022, Jackson did not do so. In fact, Jackson never signed the Term Sheet or Certificate.

52.    Between August 6 and 10, 2022, after Jackson filmed scenes for the Film, Kavanaugh, in his individual capacity and on behalf of his entities, and Savva, on behalf of Jackson, continued to discuss and negotiate the material terms of the Term Sheet and Certificate by text message.

53.    Kavanaugh claimed that "i [Kavanaugh] will need to ask producers and other talent … to give up more. not sure how they will feel cause when i got them to give up the extra 5 it was specifically for the marketing …." He further claimed that "i [Kavanaugh] paid for the private plane without blinking which was 30k and not part of the agreement and never mentioned it."

54.    When Kavanaugh asked Savva: "Is 50 pissed at me [Kavanaugh]?," Savva responded: "Not that I'm aware of. He [Jackson] wants me to get the paper done on the movie but I told him we were working on that last issue."

55.    On or about August 11 or 12, 2022, Sacker sent an email to Kavanaugh, Savva, Finkelstein, and others. The email contained the subject line "Revised Binding Term Sheet and Confidential Amendment---Curtis '50 Cent' Jackson ('Skill House')" and attached redlined and clean copies of the Term Sheet and Certificate as well as a copy of a Confidential Side Letter. Sacker wrote: "I've attached a redlined and clean copy of a further revised Binding Term Sheet as well as a Confidential Amendment thereto. I believe that this version of the Binding Term Sheet as modified by the

Confidential Amendment incorporates the final agreed upon terms. Please have Curtis execute the Binding Term Sheet, the Certificate of Employment attached to the Binding Term Sheet and the Confidential Amendment, and then scan and e-mail back a copy for counter-execution by Skill House Movie, LLC."

56.    The redline to the Term Sheet and Certificate was to the "Fixed Compensation" provision.

57.    The Confidential Amendment affected the "Contingent Compensation" provision of the Term Sheet.

58.    On August 17, 2022, Sacker followed up by e-mail, stating: "We need Curtis' agreement executed immediately to submit to SAG. Please have Curtis execute the Binding Term Sheet and Confidential Amendment right away and then scan and e-mail back for our conter-execution [sic]."

59.    On August 26, 2022, Sacker followed up by e-mail again, stating: "Following up again on this."

60.    On September 2, 2022, Sacker followed up by e-mail again, stating: "We really do need the executed agreement. When will you be able to get this to us?"

61.    Later that same day, on September 2, 2022, Finkelstein responded to Sacker, stating: "Neil, WE need to discuss the certificate."

62.    The Term Sheet, Certificate, and Confidential Amendment were never finalized and were never signed by Jackson. Defendants even admitted that: "The revisions and associated confidential side agreement were never executed." Dkt. No. 27 at 24. Upon information and belief, Kavanaugh fired Sacker for failing to finalize, and obtain Jackson's signatures for, the Term Sheet and Certificate. *See* Dkt. No. 26-5 Ex. 11 at 31.

63.    Jackson expected that Kavanaugh and Skill House Movie would continue to negotiate, memorialize, and finalize an agreement between the parties in a long-form, signed contract, but Jackson's trust in Kavanaugh was misplaced, and no final

agreement (signed or otherwise) was ever reached between the parties regarding the Film.

64.    In fact, Defendants never attempted to compensate Jackson (directly or through G-Unit) for his participation in the Film, either for his acting or for his purported role in producing the Film, until days after this lawsuit was filed and years after Jackson provided his acting services for the Film. Moreover, Defendants failed to remit appropriate SAG paperwork and fees.[10]

65.    The lack of a final, signed agreement and the failure to attempt to compensate Jackson until after this lawsuit was filed should come as no surprise because, on information and belief, Kavanaugh—as he has apparently done in the past—failed to keep proper records and unilaterally modified the Film's budget to the tune of millions of dollars making it virtually impossible for any backend compensation to be awarded.

**Defendants' Promotion of the Film Using Jackson's Name, Image, Voice, and Trademarks Without Authorization**

66.    Defendants have made Jackson the centerpiece of their promotional and marketing efforts for the Film without Jackson's authorization. Indeed, Defendants are using the 50 Cent Marks and Jackson's other intellectual property to identify and brand the Film.

67.    Despite acknowledging that Defendants could not use Jackson's name, image, or other intellectual property without Jackson's advance permission, Defendants repeatedly did just that. For example, on August 20, 2022, Kavanaugh personally sent a series of text messages to Savva and Jackson's PR consultant, stating: "Our pr team is supposed to run evwrythjbf [sic] by u. … Let me ask our pr people sorry for the Cobfusion [sic]."

---

[10] To the extent Defendants claim they have a contract with Jackson (which Jackson denies), Defendants' failure to compensate him promptly would be a material breach of any such contract.

68.     On the GenTV website, Jackson is listed in a "Starring" role and a video clip from the Film—which starts with a prominent image of Jackson and features him throughout—automatically plays in the background. Moreover, a roughly nine-minute clip from the Film is currently available for free on the GenTV website. The clip's on-screen credits prominently brand it as "A 50 CENT MOVIE" and "PRODUCED BY 50 CENT." The clip also lists "Curtis '50 Cent' Jackson" as a cast member.[11]

69.     The "Official Trailer" for the Film prominently features Jackson, and the description under the video states: "Starring multi-talented icon Curtis '50 Cent' Jackson." The trailer even features distinctive bottles of Jackson's champagne, Le Chemin du Roi.[12]

70.     Press coverage of the Film—which, on information and belief, is driven largely (if not entirely) by Defendants' marketing efforts—associates Jackson's name and reputation so closely with the Film such that the Film has been characterized as "50 Cent's Upcoming Horror Film" and "50 Cent Horror Movie."[13]

71.     The Film's Instagram page (@skillhousemovie) also features Jackson's name and trademarks. At the time of the initial Complaint, the Instagram page claimed that the Film stars "@50cent" and is produced by "@50cent." As of the filing of this Second Amended Complaint, the Instagram page still claims that the Film stars "@50cent." Defendants have otherwise used Jackson's name, image, voice, trademarks, and other intellectual property to promote and market the Film, including but not limited to on Kavanaugh's personal Instagram account (@ryankavanaughofficial) and the Film's Instagram account (@skillhousemovie).

---

[11] *See* https://skillhouse.gentv.com (last visited Dec. 1, 2025).

[12] *See* https://www.youtube.com/watch?v=aSneVvYtmY0 (last visited Dec. 1, 2025).

[13] *See, e.g.,* https://thesource.com/2025/04/14/50-cents-upcoming-horror-film-skillhouse-reportedly-so-intense-it-made-crew-member-faint/ (last visited Dec. 1, 2025); https://deadline.com/2025/03/50-cent-skillhouse-release-date-1236354851/ (last visited Dec. 1, 2025).

14

72.    For example, on January 24, 2025, Defendants published the following collaborative post, including Jackson's name, image, and trademarks, on both the @ryankavanaughofficial and @skillhousemovie Instagram accounts.[14]



73.    Moreover, Defendants continued to use Jackson's name, image, voice, trademarks, and other intellectual property to promote and market the Film even after this lawsuit was filed.

---

[14] *See* https://www.instagram.com/p/DFOYybMyypJ/ (last visited Dec. 1, 2025).

74.    On July 2, 2025, the day before the hearing on the motion for preliminary injunction, Defendants published the following post, including Jackson's name, image, voice, and trademarks, on the @skillhousemovie Instagram account.[15]



[15] *See* https://www.instagram.com/p/DLoJUymt2UA/ (last visited Dec. 1, 2025).

75.   On July 5, 2025, Defendants published the following post, including Jackson's name, image, and trademarks, on the @skillhousemovie Instagram account.[16]



76.    On July 5, 2025, Defendants published the following post, including Jackson's name and trademarks, on the @skillhousemovie Instagram account.[17]



---

[17] *See* https://www.instagram.com/p/DLvSotMyF9Q/ (last visited Dec. 1, 2025).

77.    On July 11, 2025, Defendants published the following post, including Jackson's image, on the @skillhousemovie Instagram account.[18]



78.    Jackson is also featured in the Film, which was released on July 11, 2025, without Jackson's authorization. And although Jackson only appears in a few minutes of the Film, Jackson is disproportionately featured in the promotional and marketing efforts for the Film.

79.    Despite Defendants prominently advertising Jackson's purported role as the star and producer of the Film, Jackson had no creative control over the Film. Indeed, Defendants have maintained that Jackson has no approval rights over the Film.

---

[18] *See* https://www.instagram.com/p/DL_JJOUytBT/ (last visited Dec. 1, 2025).

## Defendants Are Capitalizing on Jackson's Reputation to Launch the GenTV Streaming Platform

80.    Defendants are not only using Jackson's name, image, voice, and trademarks to promote the Film, but they are also using his intellectual property to promote their nascent streaming platform GenTV. Defendants have used Jackson's intellectual property and the Film to market and launch the GenTV streaming platform. Indeed, the Film has been marketed as the "debut" project for GenTV.

81.    Defendants' efforts to associate Jackson and his intellectual property with GenTV include, on information and belief, sponsored articles designed to mimic organic, independent press coverage. Upon information and belief, these articles were not drafted by journalists, but by a marketing agency engaged by Defendants to promote GenTV.

82.    Based on public reports, it appears that Kavanaugh and GenTV's intended business model is to have public figures and influencers both participate in GenTV's films and also take on the work of marketing the films that would traditionally be handled by the platform itself.[19]

---

[19]    *See, e.g.*, https://venturebeat.com/business/ryan-kavanaughs-gentv-advances-film-tv-and-streaming-with-record-breaking-film-skillhouse/ (last visited Dec. 1, 2025) ("By selling episodes at $0.99 to $1.99 each and leveraging social media stars for direct selling, GENTV can generate substantial revenue before a movie's release…. [T]he shorts are all together different content than the movie."). The VentureBeat article is labeled as "Contributor Content" and contains the disclaimer that "VentureBeat newsroom and editorial staff were not involved in the creation of this content," hallmarks of paid-for promotional content—likely from Defendants—rather than independent journalism.

83.    Since as early as 2023, it appears that the GenTV website has been closely tied to the Film.[20]



84.    Indeed, a July 2024 press release from GenTV stated: "'Skillhouse' marks the beginning of an ambitious project by GENTV to release 5-10 films annually, each headlined by top influencers. These films will be uniquely distributed through two distinct platforms: short-form episodic films released on social media by the influencers and traditional full-length features available in theaters and all subsequent release windows, in an attempt to merge short and long form content consumption."[21]

---

[20]  *See* https://web.archive.org/web/20230714145511/https://www.gentv.com/ (last visited Dec. 1, 2025) (version of the website as preserved by the Internet Archive on July 14, 2023).
[21]     *See*     https://www.accessnewswire.com/newsroom/en/sports-leisure-and-entertainment/gentvcoms-skillhouse-shatters-all-records-with-unprecedented-engage-894311 (last visited Dec. 1, 2025).

85.    At that time—in and around July 2024—the GenTV website contained multiple pages displaying what appear to be films or television series for streaming in a layout akin to Netflix. However, on information and belief, the content was generated by artificial intelligence or similar means.[22]



86.    The July 2024 GenTV website contained "Play Now" and "Stream Now" buttons adjacent to what appear to be films or television series.

---

[22] *See* https://web.archive.org/web/20240712145852/https://gentv.com/frontend/ (last visited Dec. 1, 2025) (version of the website as preserved by the Internet Archive on July 12, 2024).

87.     Certain of the images on the July 2024 GenTV website appear to contain derivations of the distinctive red Netflix logo.



88.   Many of the images on the July 2024 GenTV website appear to be artificial intelligence-derived versions of popular films, such as *Star Wars*, *Frozen*, *Pirates of the Caribbean*, and the Marvel *Avengers* franchise.






1    89.    In addition to that content, the July 2024 GenTV website included "Skill
2    House: Post or Die" (with a "Stream Now" button) and "Skill House 2: Like or Die"
3    (labeled as "Coming Soon"). Both were listed as "Starting: [sic] … 50 Cent."





90.    Upon information and belief, Defendants planned—and still plan—to release the Film on GenTV. Defendants' counsel stated that there is no plan to release the Film on the GenTV platform, but as of the date of this Second Amended Complaint, the Film is still being advertised, marketed, and promoted as though it will be released on GenTV. For example, the Film is still featured on the GenTV website (https://skillhouse.gentv.com), and the GenTV home page (https://gentv.com) immediately redirects to a separate website for the Film (https://skillhouse.movie).

91.    GenTV, as a startup streaming platform, is a direct competitor to Jackson's own streaming channel, 50 Cent Action. Jackson never would have agreed to, in effect, compete with himself. (Even the draft, unsigned Term Sheet does not contemplate a release via GenTV.)

92.    Before this lawsuit was commenced, Jackson repeatedly raised this issue with Defendants. For example, in August 2024, the publication *Maxim* published an online article entitled "50 Cent & Ryan Kavanaugh Take On Hollywood With Influencer-Driven GenTV," falsely implying that Jackson was affiliated with and even had a leadership or ownership role at GenTV. Jackson's representatives immediately reached out to Kavanaugh to ask him to facilitate a correction. Kavanaugh claimed that he (or his representatives) told the publication that Jackson was an "owner" of the Film (itself a false statement) but that the publication misunderstood and described Jackson as an owner of GenTV.

93.    Kavanaugh's explanation was dubious. The *Maxim* article is labeled as a "Partner" article, meaning that it is a paid-for piece and not genuine press coverage. (*Maxim*'s website explains: "Any content on Maxim.com which includes the disclaimer language 'Partner' … represents sponsored advertising content …."). In other words, the false association between Jackson and GenTV was a deliberate marketing effort by Defendants, not a reporter's misunderstanding.

94.    Jackson's representatives explained to Kavanaugh that Jackson had "just launched [his] own streaming channel" and that "[t]his is a conflict for us." They also explained that Jackson or his representatives needed to review and approve press releases or other public statements involving or referencing Jackson.

95.    In response to Jackson's complaint, the title on the *Maxim* article was changed to remove reference to GenTV: "50 Cent & Ryan Kavanaugh Take On Hollywood With 'Skill House,' A Revolutionary Influencer-Driven Project."[23]

96.    Despite having raised concerns months ago, Jackson's name, image, and trademarks still feature prominently across the GenTV platform. For example, on the GenTV website, Jackson is listed in a "Starring" role and a video clip from the Film— which starts with a prominent image of Jackson and features him throughout— automatically plays in the background. There is no other substantive content on the GenTV website.[24]



---

[23]    *See*    https://www.maxim.com/partner/50-cent-ryan-kavanaugh-take-on-hollywood-with-influencer-driven-gentv/ (last visited Dec.1, 2025).
[24] *See* https://skillhouse.gentv.com (last visited Dec. 1, 2025).

## The Film's Release

97.    On or about March 31, 2025, Defendants publicly announced that the Film would be released on July 11, 2025. Moreover, that same day, Kavanaugh texted Jackson's PR consultant to let her know that the Film would be released on July 11, 2025.

98.    Jackson and his counsel and representatives had multiple communications with Defendants' counsel in the weeks before the initial Complaint was filed and the scheduled release of the Film. Despite Jackson's efforts to amicably resolve this dispute without judicial intervention, Defendants' counsel denied that there was any dispute. They also claimed that Jackson had no "approval rights" over the Film, despite it being marketed as "A 50 CENT MOVIE" and "PRODUCED BY 50 CENT."

99.    Even more concerning, Defendants' counsel have represented that Defendants have been exploring the "franchise potential" for the Film, "including sequels, prequels, spin-offs, and remakes, which are currently in various stages of development," indicating that Defendants will continue to infringe and misappropriate Jackson's intellectual property for years to come if not enjoined from such behavior.

100.    Unable to reach a resolution with Defendants, and with the Film's release date fast approaching, Jackson was left with no choice but to file this lawsuit on April 24, 2025.

## Defendants' Conduct After the Complaint Was Filed

101.    On April 28, 2025, after the initial Complaint had been filed, two checks, dated April 28, 2025, were delivered to IAG's offices. One check was made out to "G-Unit Film Television Inc" in the amount of $703 and the memo field stated "SAG Daily Scale"; the other check was made out to "Sire Jackson" (Jackson's son) in the amount of $703 and the memo field stated "SAG Daily Scale." The checks were unsigned and were not deposited.

102. On June 12, 2025, after the motion for preliminary injunction had been filed, three checks, dated June 3, 2025, were delivered to IAG's offices. The first check was made out to "G-Unit Film Television Inc" in the amount of $703 and the memo field stated "SAG Daily Scale"; the second check was made out to Sire Jackson in the amount of $703 and the memo field stated "SAG Daily Scale"; and the third check was made out to "G-Unit Film Television Inc" in the amount of $100,000 and did not contain a memo field. None of the three checks have been deposited due to this pending litigation.

103. Following the filing of the initial Complaint, Defendants began an aggressive social media campaign to promote the Film using Jackson's name, image, voice, trademarks, and other intellectual property, as well as the lawsuit itself.

104. As they had done before this lawsuit was commenced, Defendants prominently featured Jackson in their promotional efforts, including using his name and trademarks and tagging him on social media, in order to capitalize on his reputation and goodwill.

105. The Film was released on or about July 11, 2025 and had a limited theatrical release.

106. The Film received a number of poor reviews (to the extent it was reviewed at all).

107. The website *Culture Mix* described the Film as "amateurish" and "misogynistic," as well as a "cinematic train wreck," "time-wasting brain rot," and "garbage dump of a movie."[25]

108. Horror-industry website *Bloody Disgusting* described the Film as a "superficial, poorly told homicide party." The website further commented that: "There are parts of this movie so rigid and mechanical that scenes feel (and sometimes look) like A.I., especially shots of random 'reactors' seen viewing the Skill House

---

[25] *See* https://culturemixonline.com/review-skillhouse-starring-bryce-hall-hannah-stocking-curtis-50-cent-jackson-and-neal-mcdonough/ (last visited Dec. 1, 2025).

massacre on their phones. It's the MadTV to *Deadstream*'s Saturday Night Live in terms of quality, but even that's giving too much credit."[26]

109. Film and television website *Collider* commented that the Film "Does Nothing New, And It Does It Poorly" and "Isn't Worth the Views."[27]

110. As of the date of this Second Amended Complaint, the Film has 1.5/5 stars on Bloody Disgusting, 2.3/10 stars on Letterboxd, and 3.1/10 stars on IMDb.

111. On Letterboxd, one individual commented that: "I think a $12 lobotomy would've been more enjoyable than the $12 I spent to go watch this giant pile of sh[**]." Another individual commentated that: "Actively one of the worst things I've ever seen. Barely classifies as a film. Heard 50 Cent was even suing to block the release of this and low key I wish he won!"[28]

112. The Film had a limited release, and, on information and belief, was pulled from theaters shortly after its release.

113. Upon information and belief, the Film grossed about $100,000 during its first weekend at the box office.

114. As a direct and proximate result of its poor performance and reviews, the Film has irreparably damaged Jackson's reputation and earning potential in the film and television industry. Indeed, since the Film was released, Jackson has received offers dramatically lower than expected for his acting services.

### The May 12th Settlement Agreement

115. Before the Film was released and in an attempt to amicably resolve this dispute, Plaintiffs Jackson and NYC Vibe's counsel emailed Defendants' counsel a last and final offer to settle this matter.

---

[26] *See* https://bloody-disgusting.com/movie/3887785/skillhouse-review-an-influencer-horror-satire-with-no-skills/ (last visited Dec. 1, 2025).

[27] *See* https://collider.com/skillhouse-review-50-cent-bryce-hall-horror-movie/ (last visited Dec. 1, 2025).

[28] *See* https://letterboxd.com/film/skillhouse/ (last visited Dec. 1, 2025).

116. On May 12, 2025, Plaintiffs Jackson and NYC Vibe's counsel, Craig Weiner, emailed Defendants' counsel, Lauren Fried: "Here it is. Kindly say yes or no. Mr. Jackson will unfortunately and adamantly not accept any further negotiation." The offer delineated nine specific, and separately numbered, material terms.

117. Later that same day (May 12, 2025), Defendants' counsel unequivocally accepted the offer and stated: "My client accepts your terms. We will move forward in preparing the written settlement agreement to reflect these agreed upon terms and all customary terms. This is based on the understanding that now that we have an agreement, your client will not file the preliminary injunction and we will not need to incur any additional fees responding. Please confirm and we will prepare the settlement agreement immediately." This May 12, 2025 email exchange by the parties' counsel constitutes an enforceable settlement agreement (the "May 12th Settlement Agreement"). *See* Dkt. Nos. 47-1 ¶¶ 2–3, Ex. A; 67 ¶¶ 2–3, Ex. A.[29]

118. Later that same day (May 12, 2025), Plaintiffs Jackson and NYC Vibe's counsel responded: "Thats fine. Thank you for getting this done."

119. Nevertheless, weeks later, Defendants breached the May 12th Settlement Agreement by failing to comply with their obligations under the agreement. For example, Defendants breached paragraph 1 of the May 12th Settlement Agreement by (i) failing to pay the requisite settlement amount; and (ii) materially altering and changing the method for securing payment of the settlement amount such that it was no longer the method that had been agreed to. Defendants also failed to otherwise comply with their obligations under the May 12th Settlement Agreement.

120. As a result of Defendants' material breach of the May 12th Settlement Agreement, Plaintiffs have been forced to continue to litigate this action.

---

[29] Because Defendants' counsel maintains that the terms of the May 12th Settlement Agreement are confidential and should be sealed, Plaintiffs do not identify them in this Second Amended Complaint and instead incorporate the May 12th Settlement Agreement by reference.

**First Cause of Action**

**Trademark Infringement, 15 U.S.C. § 1114**

**Plaintiffs Jackson and NYC Vibe Against All Defendants**

121.  Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 120 as though set forth fully herein.

122.  Plaintiff Jackson, through Plaintiff NYC Vibe, is the owner of the 50 Cent Marks. The 50 Cent Marks, although inherently distinctive, have also acquired substantial goodwill and secondary meaning.

123.  Defendants have made unauthorized use of the 50 Cent Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services in violation of 15 U.S.C. § 1114. Defendants have not been authorized by Plaintiffs Jackson and NYC Vibe to use the 50 Cent Marks in any manner. This infringement by Defendants has been deliberate and willful.

124.  Defendants' unauthorized use in commerce of the 50 Cent Marks as alleged herein is likely to cause confusion, cause mistake, or deceive consumers as to the affiliation, sponsorship, or endorsement of Defendants' goods and services, including but not limited to the Film and the GenTV platform, and is likely to cause consumers to believe, contrary to fact, that Defendants and their goods and services are affiliated with, sponsored by, or endorsed by Plaintiffs Jackson and NYC Vibe.

125.  Unless restrained and enjoined by this Court, Defendants will continue to make unauthorized use of the 50 Cent Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services.

126.  Defendants have committed the foregoing acts of infringement with full knowledge of Plaintiffs Jackson and NYC Vibe's rights in the 50 Cent Marks and with the willful intent to cause confusion and trade on Plaintiffs Jackson and NYC Vibe's goodwill and reputation.

127. By reason of this unauthorized use of the 50 Cent Marks, or marks confusingly similar thereto, Defendants have unlawfully and wrongfully derived, and will continue to unlawfully and wrongfully derive, income and profits from these infringing acts, and Plaintiffs have suffered, and will continue to suffer, substantial damages and irreparable injury.

128. Plaintiffs Jackson and NYC Vibe have no adequate remedy at law and are therefore entitled to injunctive relief.

### Second Cause of Action

### False Advertising and Unfair Competition, 15 U.S.C. § 1125(a)

### Plaintiffs Jackson and NYC Vibe Against All Defendants

129. Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 128 as though set forth fully herein.

130. Defendants have made false and misleading representations of fact, including the unauthorized use of Jackson's name, image, and other intellectual property rights in interstate commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services, including but not limited to the Film and the GenTV platform, in violation of 15 U.S.C. § 1125(a). Defendants have not been authorized by Plaintiffs Jackson and NYC Vibe to use Jackson's name, image, or other intellectual property rights in any manner. This unauthorized use by Defendants has been deliberate and willful.

131. Defendants' unauthorized use in interstate commerce of Jackson's name, image, and other intellectual property rights as alleged herein is likely to cause confusion, cause mistake, or deceive consumers as to the affiliation, sponsorship, or endorsement of Defendants' goods and services, and is likely to cause consumers to believe, contrary to fact, that Defendants and their goods and services are affiliated with, sponsored by, or endorsed by Plaintiffs Jackson and NYC Vibe.

132.  Unless restrained and enjoined by this Court, Defendants will continue to make unauthorized use of Jackson's name, image, and other intellectual property rights in commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services.

133.  Defendants have committed this unauthorized use with the willful intent to cause confusion and trade on Plaintiffs Jackson and NYC Vibe's goodwill and reputation.

134.  By reason of this unauthorized use of Jackson's name, image, and other intellectual property rights, Defendants have unlawfully and wrongfully derived, and will continue to unlawfully and wrongfully derive, income and profits from these infringing acts, and Plaintiffs Jackson and NYC Vibe have suffered, and will continue to suffer, substantial damages and irreparable injury.

135.  Plaintiffs Jackson and NYC Vibe have no adequate remedy at law and are therefore entitled to injunctive relief.

### Third Cause of Action

### Violation of Common Law Right of Publicity

### Plaintiff Jackson Against All Defendants

136.  Plaintiff Jackson realleges and incorporates by reference the allegations against all Defendants contained in paragraphs 1 through 135 as though set forth fully herein.

137.  Through Defendants' unauthorized use of Jackson's identity, including but not limited to his name, image, and voice, Defendants have misappropriated Jackson's rights in his name and identity as provided under the common law right of publicity.

138.  In exploiting and appropriating Jackson's exclusive publicity rights, Defendants have damaged and are continuing to damage those rights by, among other things, tarnishing and exploiting those rights without Jackson's permission, thus diminishing their value, including without limitation their value for future licensing.

Further, Defendants have injured and continue to injure Jackson by exploiting his publicity rights without Jackson retaining control thereof or receiving any income properly owing to him as the sole owner of his rights of publicity.

139.  Defendants did not engage in such wrongful actions out of any sincere or proper motive, but did so knowingly, willfully, oppressively, and maliciously, intending to appropriate to themselves without compensation what they knew to be Jackson's valuable rights. Said misconduct was also fraudulent, in that the public has been misled and will continue to be misled to believe, incorrectly, that Jackson consented to such commercial use of his name and identity, when in fact he did not, and that Jackson is endorsed the Film and the GenTV platform, when in fact he did not.

140. As a direct and proximate result of Defendants' conduct, Jackson has suffered, and will continue to suffer, substantial damages and irreparable injury.

141. Jackson has no adequate remedy at law and is therefore entitled to injunctive relief.

### Fourth Cause of Action

**Violation of Statutory Right of Publicity, California Civil Code § 3344**

**Plaintiff Jackson Against All Defendants**

142. Plaintiff Jackson realleges and incorporates by reference the allegations against all Defendants contained in paragraphs 1 through 141 as though set forth fully herein.

143. Defendants have misappropriated Jackson's publicity rights, including but not limited to his name, image, and voice, for purposes of advertising and selling their goods or services without Jackson's permission, in violation of California Civil Code § 3344.

144. In knowingly exploiting Jackson's publicity rights, Defendants have damaged and are continuing to damage those rights by, among other things, tarnishing and trivializing those rights, thus diminishing their value, including without limitation

their value for future licensing. Further, Defendants have injured and continue to injure Jackson by purporting to exercise Jackson's publicity rights without Jackson retaining control thereof or receiving any income properly owing to him as the sole owner of his right to publicity.

145. Defendants did not engage in such wrongful actions out of any sincere or proper motive, but did so knowingly, willfully, and oppressively, intending to appropriate to themselves without compensation what they knew to be Jackson's valuable rights. Said misconduct was also fraudulent, in that the public has been misled and will continue to be misled to believe, incorrectly, that Jackson consented to such commercial use of his name and identity, when in fact he did not, and that Jackson endorsed the Film and the GenTV platform, when in fact he did not.

146. As a direct and proximate result of Defendants' conduct, Jackson has suffered, and will continue to suffer, substantial damages and irreparable injury.

147. Jackson has no adequate remedy at law and is therefore entitled to injunctive relief.

### Fifth Cause of Action

### Unfair Competition, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### Plaintiffs Jackson and NYC Vibe Against All Defendants

148. Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 147 as though set forth fully herein.

149. Defendants have engaged in fraudulent, unfair, and unlawful conduct in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* Specifically, Defendants have competed unfairly, deceptively, untruly, and misleadingly by, among other things, knowingly and willfully making unauthorized use of Jackson's name, image, and other intellectual property rights in connection with their efforts to sell and market goods and services, including the Film and the GenTV platform.

150.  For example, Defendants have engaged in marketing efforts which falsely state or imply that Jackson is affiliated with, and even has an ownership role with, the GenTV platform. These statements are false and misleading. Jackson did not authorize his name, image, or other intellectual property rights to be used in connection with the Film or the GenTV platform.

151.  As a result of Defendants' unlawful actions, consumers are likely to be confused and deceived. For example, consumers are likely to believe that Jackson is affiliated with or endorses the GenTV streaming platform, when in fact Jackson has his own competing streaming channel. Similarly, consumers are likely to believe that Jackson endorsed the Film, when in fact he had no creative input into the Film whatsoever.

152.  Defendants' actions have been and continue to be knowing and willful.

153.  As a direct and proximate result of Defendants' conduct, Plaintiffs Jackson and NYC Vibe have suffered injury and irreparable harm and will continue to suffer such injury and irreparable harm unless Defendants are enjoined from such further conduct.

### Sixth Cause of Action

### False Advertising, Cal. Bus. & Prof. Code § 17500

### Plaintiffs Jackson and NYC Vibe Against All Defendants

154.  Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 153 as though set forth fully herein.

155.  Defendants have published or disseminated intentionally false and misleading statements in an effort to associate Jackson with the Film and the GenTV platform.

156.  For example, Defendants have engaged in marketing efforts which falsely state or imply that Jackson is affiliated with, and even has an ownership role with, the GenTV platform. These statements are false and misleading. Jackson did not

authorize his name, image, or other intellectual property rights to be used in connection with the Film or the GenTV platform.

157. As a result of Defendants' unlawful conduct, the public and potential consumers of the types of goods and services Defendants offer are likely to be confused and deceived. For example, consumers are likely to believe that Jackson is affiliated with or endorses the GenTV streaming platform, when in fact Jackson has his own competing streaming channel. Similarly, consumers are likely to believe that Jackson endorsed the Film, when in fact he had no creative input into the Film whatsoever.

158. Defendants' actions have been and continue to be knowing and willful.

159. As a direct and proximate result of Defendants' conduct, Plaintiffs Jackson and NYC Vibe have suffered irreparable harm and will continue to suffer such harm unless Defendants are enjoined from such further conduct.

**Seventh Cause of Action**

**Trademark Infringement, California Common Law**

**Plaintiffs Jackson and NYC Vibe Against All Defendants**

160. Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 159 as though set forth fully herein.

161. Jackson, directly or through NYC Vibe, is the owner of the 50 Cent Marks and other valuable intellectual property. The 50 Cent Marks, although inherently distinctive, have also acquired substantial goodwill and secondary meaning.

162. Defendants have made unauthorized use of the 50 Cent Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services. Defendants have not been authorized by Plaintiffs Jackson and NYC Vibe to use the 50 Cent Marks in any manner. This infringement by Defendants has been deliberate and willful.

163. Defendants' unauthorized use in commerce of the 50 Cent Marks as alleged herein is likely to cause confusion, cause mistake, or deceive consumers as to the affiliation, sponsorship, or endorsement of Defendants' goods and services, including but not limited to the Film and the GenTV platform, and is likely to cause consumers to believe, contrary to fact, that Defendants and their goods and services are affiliated with, sponsored by, or endorsed by Plaintiffs Jackson and NYC Vibe.

164. Unless restrained and enjoined by this Court, Defendants will continue to make unauthorized use of the 50 Cent Marks in commerce in connection with the sale, offering for sale, distribution, and advertising of goods or services.

165. Defendants have committed the foregoing acts of infringement with full knowledge of Plaintiffs Jackson and NYC Vibe's rights in the 50 Cent Marks and with the willful intent to cause confusion and trade on Plaintiffs Jackson and NYC Vibe's goodwill and reputation.

166. By reason of this unauthorized use of the 50 Cent Marks, Defendants have unlawfully and wrongfully derived, and will continue to unlawfully and wrongfully derive, income and profits from these infringing acts, and Plaintiffs Jackson and NYC Vibe have suffered, and will continue to suffer, substantial damages and irreparable injury.

167. Plaintiffs Jackson and NYC Vibe have no adequate remedy at law and are therefore entitled to injunctive relief.

**Eighth Cause of Action**

**Unfair Competition, California Common Law**

**Plaintiffs Jackson and NYC Vibe Against All Defendants**

168. Plaintiffs Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 167 as though set forth fully herein.

169. Through their unauthorized use of Jackson's name, image, and other valuable intellectual property rights, including the 50 Cent Marks, Defendants have

willfully and without permission misappropriated Jackson's intellectual property rights. These unlawful actions by Defendants have harmed Plaintiffs Jackson and NYC Vibe's investment and goodwill in Jackson's reputation, as well as their other intellectual property rights, including the 50 Cent Marks.

170. Jackson's name, image, and other intellectual property rights, including the 50 Cent Marks, have acquired substantial goodwill and secondary meaning. Despite that, Defendants, without authorization, made use of Jackson's intellectual property in order to mislead consumers into associating Jackson with the Film and the GenTV platform.

171. For example, Defendants have engaged in marketing efforts which falsely state or imply that Jackson is affiliated with, and even has an ownership role with, the GenTV platform. These statements are false and misleading. Jackson did not authorize his name, image, or other intellectual property rights to be used in connection with the Film or the GenTV platform.

172. As a result of Defendants' unlawful actions, consumers are likely to be confused and deceived. For example, consumers are likely to believe that Jackson is associated with or endorses the GenTV streaming platform, when in fact Jackson has his own competing streaming channel. Similarly, consumers are likely to believe that Jackson endorsed the Film, when in fact he had no creative input into the Film whatsoever.

173. Defendants' actions have been and continue to be knowing and willful.

174. As a direct and proximate result of Defendants' conduct, Plaintiffs Jackson and NYC Vibe have suffered, and will continue to suffer, substantial damages and irreparable injury.

175. Plaintiffs Jackson and NYC Vibe have no adequate remedy at law and are therefore entitled to injunctive relief.

**<u>Ninth Cause of Action</u>**

**Breach of Contract (the July 30th Draft)**

**Plaintiffs Jackson and G-Unit Against Defendant Skill House Movie**

**[PLEADED IN THE ALTERNATIVE]**

176.  Plaintiffs Jackson and G-Unit reallege and incorporate by reference the allegations against Defendant Skill House Movie contained in paragraphs 1 through 120 as though set forth fully herein.

177.  Plaintiffs Jackson and G-Unit bring this breach of contract claim in the alternative in the event that this Court determines that the July 30, 2022 draft Term Sheet and Certificate (the "July 30th Draft") is an enforceable agreement between Jackson and G-Unit, on the one hand, and Skill House, on the other hand. *See* Dkt. No. 26-4 Ex. 13.

178.  On July 30, 2022, Sacker sent an e-mail to Savva, Finkelstein, and others, with the subject line "Final Version of Curtis Jackson Binding Term Sheet---'Skill House'" and attached redlined and clean copies of the July 30th Draft. Sacker wrote: "As promised, I've attached a redlined and clean copy of the final version of 50's Binding Term Sheet in connection with 'Skill House'. Please have 50 execute the Binding Term Sheet including the Certificate of Employment and then scan and e-mail back a copy for counter-execution."

179.  Paragraph 4 of the July 30th Draft provided that "SHM [Skill House Movie] shall pay to Employer [G-Unit, Jackson's company, on behalf of Jackson] on a pay-or-play basis fixed compensation of $100,000 payable within five (5) business days from completion of the services set forth in Paragraph 1 above."

180.  Paragraph 7 of the July 30th Draft also provided that "CJ [Curtis Jackson] shall have the right to approve all marketing and publicity materials that utilize his name or likeness."

181.  Although the July 30th Draft does not constitute an enforceable agreement because it continued to be negotiated and revised, and the July 30th Draft

was never finalized or signed, to the extent Defendants allege—and this Court finds—that the July 30 Draft constitutes an enforceable agreement, Defendant Skill House Movie materially breached that agreement.

182. To the extent the July 30 Draft constitutes an enforceable agreement, Plaintiffs Jackson and G-Unit fully performed any obligations under the July 30th Draft up to the time of Defendant Skill House Movie's breach, including but not limited to providing "[o]ne day of services in connection with publicity and marketing materials on August 1, 2022 and one day of acting services on August 2" as set forth in Paragraph 1 of the July 30th Draft.

183. To the extent the July 30th Draft constitutes an enforceable agreement, Defendant Skill House Movie materially breached that agreement by, *inter alia*, (i) failing to pay G-Unit $100,000 in fixed compensation within five business days from completion of Jackson's services on August 2, 2022 (*i.e.*, August 9, 2022); and (ii) failing to request and receive Jackson's prior approval before using Jackson's name, image, voice, trademarks, and other intellectual property in marketing and publicity materials for the Film.

184. To the extent the July 30 Draft constitutes an enforceable agreement, Plaintiffs Jackson and G-Unit have suffered substantial damages as a direct and proximate result of Defendant Skill House Movie's material breach of the agreement.

## Tenth Cause of Action

### Breach of Contract (the June 26th Email)

### Plaintiffs Jackson and G-Unit Against Defendants Kavanaugh and Skill House Movie

### [PLEADED IN THE ALTERNATIVE]

185. Plaintiffs Jackson and G-Unit reallege and incorporate by reference the allegations against Defendants Kavanaugh and Skill House Movie contained in paragraphs 1 through 120 as though set forth fully herein.

186. Plaintiffs Jackson and G-Unit bring this breach of contract claim in the alternative in the event that this Court determines that the June 26, 2022 email from Savva to Sacker and Kavanaugh (the "June 26th Email") is an enforceable agreement between Jackson and G-Unit, on the one hand, and Kavanaugh and Skill House Movie, on the other hand. *See* Dkt. No. 26-4 Ex. 2.

187. On June 26, 2022, Savva sent the June 26th Email to Kavanaugh and his counsel, Sacker, memorializing proposed terms that had been previously exchanged via text message to, and discussed over the phone with, Kavanaugh directly..

188. The June 26th Email provided that: "Fee will be scale +balance of the $100k paid as a producer fee."

189. The June 26th Email also provided that: "All press and promo to be coordinated through our publicist Amanda" and "All usages of his [Jackson's] image, name and likeness subject to prior written approval."

190. Although the June 26th Email does not constitute an enforceable agreement because it is missing material terms and a number of proposed terms are open to interpretation, future negotiation, and subsequent events, to the extent Defendants allege—and this Court finds—that the June 26th Email constitutes an enforceable agreement, Defendants Kavanaugh and Skill House Movie materially breached that agreement.

191. To the extent the June 26th Email constitutes an enforceable agreement, Defendant Kavanaugh assented to be personally bound by its terms and obtained the principal benefits of Jackson's performance both for himself, personally, and for Skill House Movie, an entity he owns and controls.

192. To the extent the June 26th Email constitutes an enforceable agreement, Plaintiffs Jackson and G-Unit fully performed any obligations under the July 26th Email up to the time of Defendants Kavanaugh and Skill House Movie's breach, including but not limited to providing promotional and acting services.

193.  To the extent the June 26th Email constitutes an enforceable agreement, Defendants Kavanaugh and Skill House Movie materially breached that agreement by, *inter alia*, (i) failing to pay Jackson and G-Unit $100,000 in fixed compensation in a prompt and timely manner; and (ii) failing to request and receive Jackson's prior approval before using Jackson's name, image, voice, trademarks, and other intellectual property in marketing and publicity materials for the Film.

194.  To the extent the June 26th Email constitutes an enforceable agreement, Plaintiffs Jackson and G-Unit have suffered substantial damages as a direct and proximate result of Defendants Kavanaugh and Skill House Movie's material breach of the agreement.

**Eleventh Cause of Action**

**Breach of Contract (the May 12th Settlement Agreement)**

**Plaintiffs Jackson and NYC Vibe Against All Defendants**

195. Jackson and NYC Vibe reallege and incorporate by reference the allegations against all Defendants contained in paragraphs 1 through 194 as though set forth fully herein.

196. On May 12, 2025, Plaintiffs Jackson and NYC Vibe and Defendants Kavanaugh, Skill House Movie, and GenTV entered into an enforceable settlement agreement. The May 12th Settlement Agreement was previously filed in redacted form and under seal (*see* Dkt. Nos. 47-1 ¶¶ 2–3, Ex. A; 67 ¶¶ 2–3, Ex. A) and is incorporated herein by reference.

197.  The May 12th Settlement Agreement is a valid, binding, and enforceable agreement.

198.  Plaintiffs Jackson and NYC Vibe fully performed any obligations under the May 12th Settlement Agreement up to the time of Defendants' breach of the agreement.

199.  Defendants materially breached the May 12th Settlement Agreement by, *inter alia*, (i) failing to pay the requisite settlement amount set forth in Paragraph 1 of

44

the agreement; (ii) materially altering and changing the method for securing payment of the settlement amount set forth Paragraph 1 of the agreement such that it was no longer the method that the parties had agreed to; and (iii) failing to otherwise comply with their obligations under the agreement.

200.  Plaintiffs Jackson and NYC Vibe have suffered substantial damages as a direct and proximate result of Defendants' material breach of the May 12th Settlement Agreement.

201.  Plaintiffs Jackson and NYC Vibe are also entitled to the relief provided for in Paragraph 9 of the May 12th Settlement Agreement.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1.    For entry of preliminary and permanent injunctions prohibiting Defendants and each of their agents, owners, shareholders, partners, employees, attorneys, assigns, and all others associated or acting in concert with them from committing further unlawful or infringing acts including:

    a.  Using Plaintiffs Jackson and NYC Vibe's intellectual property in connection with the sale, offering for sale, distribution, and advertising of the *Skill House* film;

    b.  Using Plaintiffs Jackson and NYC Vibe's intellectual property in connection with the sale, offering for sale, distribution, and advertising of the GenTV streaming platform;

    c.  Engaging in any further acts of infringement and/or misappropriation of Plaintiffs Jackson and NYC Vibe's intellectual property rights, including the 50 Cent Marks;

    d.  Making, implying, or displaying statements or representations that are likely to lead the public to believe that Plaintiffs Jackson and NYC Vibe in any way approved or endorsed the *Skill House* film

45

and/or the GenTV streaming platform or authorized Plaintiffs Jackson and NYC Vibe's intellectual property to be used in connection with the *Skill House* film and/or the GenTV streaming platform;

    e. Aiding, assisting, or abetting any other individual or entity in doing any act prohibited under any claim alleged herein;

2. For an award to Plaintiffs Jackson and NYC Vibe of actual damages in an amount to be proven at trial, but no less than $5,000,000;

3. For an order that Defendants account and pay to Plaintiffs Jackson and NYC Vibe all profits derived from Defendants' unlawful conduct;

4. For an award to Plaintiffs Jackson and NYC Vibe of Defendants' aforementioned profits resulting from their unlawful conduct;

5. For an award to Plaintiffs Jackson and NYC Vibe of treble damages and increased profits;

6. For an award to Plaintiffs Jackson and G-Unit of actual damages in an amount to be proven at trial, but no less than $100,000;

7. For an award to Plaintiffs Jackson and NYC Vibe of the relief set forth in Paragraph 9 of the May 12th Settlement Agreement;

8. For an award to Plaintiffs of punitive and exemplary damages;

9. For an award to Plaintiffs of interest in an amount according to law;

10. For an award to Plaintiffs of their reasonable attorneys' fees and costs; and

11. For an award to Plaintiffs of such other and further relief at law or in equity as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury trial in this action on all claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  December 2, 2025          BLANK ROME LLP


                                  By: */s/ Jonathan A. Loeb*
                                      Jonathan A. Loeb
                                  Attorneys for Plaintiffs
                                  CURTIS J. JACKSON, III, NYC VIBE, LLC,
                                  AND G-UNIT FILM & TELEVISION, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 2, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Central District of California, using the Court's Electronic Case Filing (ECF) system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on December 2, 2025.

By:  _/s/AJ Cruickshank_____

---

PROOF OF SERVICE

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 2, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States District Court, Central District of California, using the Court's Case Management and Electronic Case Filing (CM/ECF) system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.

DATED:  December 2, 2025

*/s/ Jonathan A. Loeb*
Jonathan A. Loeb