LOEB & LOEB LLP
JOHN M. GATTI (SBN 138492)
jgatti@loeb.com
LAUREN J. FRIED (SBN 309005)
lfried@loeb.com
TYLER DOWNING (SBN 339537)
tdowning@loeb.com
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: 310-282-2000
Facsimile: 310-282-2200

*Attorneys for Defendant*
RYAN KAVANAUGH, *and*
*Defendants and Counter-Claimants* SKILL HOUSE MOVIE LLC, and GENTV LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

CURTIS J. JACKSON, III, NYC VIBE, LLC, and G-UNIT FILM & TELEVISION, INC.,

Plaintiffs,

v.

RYAN KAVANAUGH, SKILL HOUSE MOVIE LLC, and GENTV LLC,

Defendants.

SKILL HOUSE MOVIE LLC and GENTV LLC,

Counter-Claimants,

v.

CURTIS J. JACKSON, III, and G-UNIT FILM & TELEVISION, INC.,

Counter-Defendants.

Case No. 2:25-CV-3623-HDV-RAO

**COUNTER-CLAIMANTS' OPPOSITION TO COUNTER-DEFENDANTS' SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS THE COUNTERCLAIM**

Complaint Filed: April 24, 2025
TAC Filed: September 3, 2025
Counterclaim Filed: January 20, 2026

## Table of Contents


Page

I. INTRODUCTION ..... 9
II. BACKGROUND ..... 12
A. Factual Background ..... 12
1. Skill House and Curtis Jackson ..... 12
2. The Agreement ..... 13
3. Jackson's Performance and Attempted Renegotiation ..... 14
4. Jackson's Stops Providing Customary Publicity and Begins Disparaging the Film ..... 14
5. The Downstream Effects of Jackson's Breach ..... 15
B. Procedural History ..... 15
III. ARGUMENT ..... 16
A. The Applicable Legal Standard ..... 16
B. Jackson Impermissibly Relies on Materials Outside the Pleadings, Which the Court Should Ignore ..... 17
C. The Court Should Deny Jackson's Motion to Dismiss ..... 18
1. The Breach of Contract Counterclaim is Well Plead ..... 19
a. Skill House Movie Pleads its Performance or Excuse for Nonperformance. 19
b. Jackson's Breach is Alleged in the Counterclaims ..... 22
c. Skill House Movie Alleges Damages Against Jackson ..... 23
2. The Implied Covenant Claim is Adequately Alleged ..... 24
3. The Intentional Interference Claim Readily Survives Jackson's Motion to Dismiss ..... 26
4. There is No Claim for Trade Libel in the Counterclaims ..... 28
D. Leave to Amend is Proper ..... 28
E. Jackson's Anti-SLAPP Motion Also Fails as a Matter of Law ..... 29
1. Federal Law Does Not Endorse the Application of anti-SLAPP Provisions in Federal Court ..... 29
2. Even if the Court Chooses to Review Jackson's anti-SLAPP Motion, it Fails as a Matter of Law ..... 30
a. Step One: The Claims Do Not Arise Entirely From Protected Speech ..... 30
b. Step Two: The Claims are Adequately Plead and Claimants Have a Likelihood of Prevailing on their Counterclaims ..... 32
F. Cross-Defendants Have No Claim to Fees, Even if the Claims are Dismissed ..... 33
IV. CONCLUSION ..... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alipour v. U.S. Dep't of State*,
2024 WL 4867239 (C.D. Cal. Oct. 7, 2024) .......... 18

*Antablin v. Motion Picture Costumers, Loc.#705*,
2021 WL 4732929 (C.D. Cal. July 6, 2021) .......... 28

*Berk v. Choy*,
607 U.S. __, 146 S.Ct. 546 (2026) .......... 29, 30

*Blockchain Innovation, LLC v. Franklin Resources, Inc.*,
2023 WL 2576314 (N.D. Cal. Mar. 20, 2023) .......... 20

*Callister v. James B. Church & Assocs.*,
108 Cal. App. 5th 185 (2025) .......... 31

*Cathay Logistics, LLC v. Gerber Plumbing Fixtures, LLC*,
2016 WL 3912011 (C.D. Cal. July 19, 2016) .......... 27

*Celador Intern. Ltd. v. Walt Disney Co.*,
347 F. Supp. 2d 846 (C.D. Cal. 2004) .......... 24, 25

*CelLink Corp. v. Manaflex LLC*,
2025 WL 1993517 (N.D. Cal. July 17, 2025) .......... 18

*Conlan v. Reilly*,
No. 2:24-cv-03002, Dkt. 100; 2025 WL 4058569, at *3 (C.D. Cal. May 16, 2025) .......... 33

*DCR Mktg. Inc. v. U.S. Alliance Grp.*
2020 WL 7084549 (C.D. Cal. Oct. 28, 2020) .......... 24

*Deerpoint Group, Inc. v. Agrigenix, LLC*,
393 F. Supp. 3d 968 (E.D. Cal. 2019) .......... 26

*Ellertson v. City of Mesa*,
2016 WL 97538 (D. Ariz. Jan. 8, 2016) .......... 18

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .......... 28

*eOnline Global, Inc. v. Google LLC*,
387 F. Supp. 3d 980 (N.D. Cal. 2019) .......... 21

*Evox Prods., LLC v. Yahoo Inc.*,
2024 WL 629472 (C.D. Cal. Jan. 18, 2024) .......... 20

*Fed'l Deposit Ins. Corp. for Indymac Bank v. DHI Mortg. Co.*,
2010 WL 11578521 (C.D. Cal. Aug. 23, 2010) .......... 18

*Finato v. Keith Fink & Assocs.*,
2017 WL 3075510 (C.D. Cal. May 17, 2017) .......... 20

*Forman v. Davis*,
371 U.S. 178 (1962) .......... 28

*Garbini v. Protection One, Inc.*,
49 F. App'x 169 (9th Cir. 2002) .......... 19, 20

*Geiger v. Charter Communications, Inc.*,
2019 WL 4284502 (C.D. Cal. Jan. 23, 2019) .......... 25

*Goldberg v. BAC Home Loans Servicing, LP*,
2013 WL 4501014 (S.D. Cal. Aug. 21, 2013) .......... 21

*Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Assn.*,
19 Cal. App. 5th 399, 426 (2018) .......... 26

*Gopher Media LLC v. Melone*,
154 F.4th 696 (9th Cir. 2025) .......... 29, 30

*Griffin v. Strauss*,
2023 WL 9687266, at *25 (C.D. Cal. July 3, 2023) .......... 33

*Grove v. Mead Sch. Dist. No. 354*,
753 F.2d 1528 (9th Cir. 1985) .......... 18

*Guz v. Bechtel Nat. Inc.*,
24 Cal.4th 317 (2000) .......... 26

*Hall v. City of Santa Barbara*,
833 F.2d 1270 (9th Cir. 1986) .......... 16

*Harvey v. Centene Mgmt. Co.*,
357 F. Supp. 3d 1073 (E.D. Wash. Nov. 21, 2018) .......... 22

*Hill v. Metro Goldwyn Mayer Studios Inc.*,
2024 WL 4801854 (C.D. Cal. Oct. 1, 2024) .......... 30

*Hunter v. Chatman*,
2018 WL 10076846 (C.D. Cal. Nov. 20, 2018)........................................................ 16

*Jobscience, Inc. v. CVPartners, Inc.*,
2014 WL 93976 (N.D. Cal. Jan. 9, 2014)............................................................ 23

*Jurin v. Google, Inc.*,
768 F. Supp. 2d 1064 (E.D. Cal. 2011)................................................................ 26

*Kentwool Co. v. NetSuite Inc.*,
2015 WL 693552 (N.D. Cal. Feb. 8, 2015)........................................................... 22

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)................................................................................ 17

*Littlefield v. Littlefield*,
106 Cal. App. 5th 815 (2024)........................................................................ 31, 32

*Longest v. Green Tree Servicing, LLC*,
74 F. Supp. 3d 1289 (C.D. Cal. 2015)........................................................... 24, 25

*MAG Aerospace Indus., LLC v. Precise Aerospace Mfg.*,
2019 WL 6655398 (C.D. Cal. May 15, 2019)........................................................ 21

*Marsu, B.V. v. Walt Disney Co.*,
185 F.3d 932 (9th Cir. 1999)......................................................................... 24, 25

*Mendiondo v. Centinela Hosp. Medica Ctr.*,
521 F.3d 1097 (9th Cir. 2008).............................................................................. 16

*Miller v. Gammie*,
335 F.3d 889 ....................................................................................................... 29

*Miller v. Rykoff-Sexton, Inc.*,
845 F.2d 209 (9th Cir. 1988)................................................................................ 29

*MNE Trucking, Inc. v. OJ Com., LLC*,
2023 WL 9511164 (C.D. Cal. Dec. 28, 2023)............................................... 16, 19, 20

*Pacific Rollforming, LLC v. Trakloc North America, LLC*,
2010 WL 2523946 (S.D. Cal. June 18, 2010)........................................................ 24

*Park v. Nazari*, 93 Cal. App. 5th 1099 (2023) ........................................................ 31

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018)......................................................................... *passim*

*Potovsky v. Lincoln Benefit Life*, 2023 WL 8461171 (N.D. Cal. Dec. 6, 2023) .......... 21

*Precision Orthopedic Implants Inc v. Limacorporate S.P.A.*, 2016 WL 7378878 (C.D. Cal. Dec. 20, 2016) .......... 27

*Pro-Com Prods., Inc. v. Kings Express LA, Inc.*, 2019 WL 1771652 (C.D. Cal. Feb. 21, 2019) .......... 25

*Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801 (N.D. Cal. 2019) .......... 16, 19, 33

*Ronpak, Inc. v. Electronics for Imaging, Inc.*, 2015 WL 179560 (N.D. Cal. Jan. 14, 2015) .......... 22, 23

*Sierra View Local Health Care District v. Influence Health, Inc.*, 2016 WL 2346799 (E.D. Cal. May 4, 2016) .......... 20, 22

*Soil Retention Prods. v. Brentwood Indus.*, 582 F. Supp. 3d 725 (S.D. Cal. 2022) .......... 23

*Solyndra Residual Trust v. Suntech Power Holdings Co., Ltd*, 62 F. Supp. 3d 1027 (N.D. Cal. Mar. 31, 2014) .......... 27

*Sommer v. United States*, 713 F. Supp. 2d 1191 (S.D. Cal. 2010) .......... 18

*Song v. Telesair, Inc.*, 2025 WL 3139029 (C.D. Cal. Oct. 2025) .......... 27

*Stemmelin v. Matterport, Inc.*, 2022 WL 3226973 (N.D. Cal. Aug. 10, 2022) .......... 25

*Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938 (N.D. Cal. 2015) .......... 24

*Trinidade v. Reach Media Group, LLC*, 2013 WL 3977034 (N.D. Cal. 2013) .......... 27

*Turner v. Real Time Resolutions, Inc.*, 2022 WL 14118935 (S.D. Cal. Oct. 24, 2022) .......... 21

*U.S. Bank, N.A. for Registered Holders of ML-CFC Com. Mortg. Tr. 2007-7 v. Miller*, 2013 WL 12183652, at 4 n.34 (C.D. Cal. May 8, 2013) .......... 21

*United States v. City of Redwood City*, 640 F.2d 963 (9th Cir. 1981) .......... 16

*United Tactical Systems, LLC v. Real Action Paintball, Inc.*,
143 F. Supp. 3d 982 (N.D. Cal. 2015) .......... 26, 27

*Vanguard Integrity Pros., Inc. v. Team Gordon, Inc.*,
2008 WL 11342701 (C.D. Cal. Apr. 4, 2008) .......... 22

*Verizon Del., Inc. v. Covad Commc'ns Co.*,
377 F.3d 1081 (9th Cir. 2004) .......... 16, 18, 29, 33

*Western Insurance Co. v. Frontier Homes, LLC*,
2018 WL 8220544, at *2 (C.D. Cal. Mar. 27, 2018) .......... 17, 23

*Wynn v. Chanos*,
75 F. Supp. 3d 1228 (N.D. Cal. 2014) .......... 17, 19

*Xu v. Huang*,
73 Cal. App. 5th 802 (2021) .......... 32

**Statutes**

Cal. Civ. Proc. Code. § 425.16(e)(3) .......... 30

Cal. Civ. Proc. Code § 425.16 .......... 9, 16, 30

Cal. Code Civ. Proc. § 425.16(e) .......... 31

**Court Rules**

Fed. R. Civ. P. 8 .......... 16, 19, 22, 23

Fed. R. Civ. P. 8(a) .......... 16

Fed. R. Civ. P. 8(d) .......... 11, 24

Fed. R. Civ. P. 12 .......... 30

Fed. R. Civ. P. 12(b)(6) .......... 9, 16, 17, 32

Fed. R. Civ. P. 12(d) .......... 18, 30

Fed. R. Civ. P. 15 .......... 33

Fed. R. Civ. P. 15(a) .......... 16

Fed. R. Civ. P. 15(a)(2) .......... 28

Fed. R. Civ. P. 56 .......... 17, 18

**Other Authorities**

Disparage, BLACK'S LAW DICTIONARY (12th ed. 2024).................................................. 28

Counter-Claimants Skill House Movie LLC and GenTV LLC ("Claimants") submit this opposition to Curtis Jackson and G-Unit Film & Television Inc.'s (together, "Jackson") Notice of Motions and [1] Special Motion to Strike Pursuant to California's Anti-SLAPP Statute, Cal. Civ. Proc. Code § 425.16 and [2] Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), Dkt. 98 (collectively, the "Motion" or "Mot.").

## I. INTRODUCTION

Contrary to Jackson's Motion, this case is not about social media posts, it is about a film and Jackon's failure to abide by the terms of an agreement he struck for his involvement in that film. Curtis Jackson (better known as 50 Cent) and his loan out company G-Unit entered into an agreement promising, among other obligations, to promote the feature film *Skill House* (the "Film"). Jackson did not provide the promised marketing and publicity services, breaching the agreement. Worse, he did the opposite. Rather than promote the Film, Jackson trashed it and questioned whether it could even be released. As a sophisticated repeat player in the entertainment industry, Jackson knew that the Film, on the verge of release, had distribution deals in place. He also knew that clouding title to the Film by claiming he would be "killing" it would cause those deals to fall apart. Unsurprisingly, Jackson's plan succeeded and the Film's release was destroyed.

The story is that simple. Based on his own conduct, Jackson is liable for his breach of the contract (whether under the express terms, the implied covenant, or both) and his interference with the distribution deals Claimants had in place for the Film's distribution.

Jackson, however, seeks to avoid accountability for his wrongful conduct and dodge the discovery that will reveal the full extent of his bad faith. To do so, Jackson relies on a combined Motion to Dismiss and anti-SLAPP Motion. Both halves of the combined Motion fail for several independent reasons.

***First***, Jackson's Motion makes two fundamental errors that permeate the entirety of the Motion: (1) he ignores the most basic and fundamental black letter law by repeatedly relying on evidence and supposed facts *not included within the Counterclaim* to justify the Motion, and (2) he urges the Court to draw inferences against Claimants. This Court has already told Jackson, reliance on evidence outside the pleadings at this stage is impermissible. Dkt. (Sealed Order) at 7:21-25.

That same principle applies to Jackson's anti-SLAPP motion because he styles it as an attack on the pleadings and no discovery has taken place. Jackson's arguments on the merits fare no better. At each step, Jackson tries to mischaracterize the pleadings and draw all inferences against Claimants to support the Motion. But taking the allegations as true and drawing all inferences in favor of Claimants, as is required by law, each Counterclaim is well pled.

***Second***, Jackson's Motion to Dismiss fails on the merits as each cause of action is properly pled. However, before turning to the claims that *are* pled, it is worth addressing one that is *not*. In his Motion, Jackson devotes page after page arguing against a claim for trade libel. That claim ***does not exist***. It is nothing more than a strawman Jackson creates to distract from the Motion's abject failure to justify dismissal of those claims that are alleged. The fact that Jackson spends just as much or more time addressing a fictional claim than he does addressing any of the claims actually brought by Claimants should tell the Court all it needs to know. In spite of Jackson's attempt to derail the Court, each and every cause of action in the Counterclaim is well-pled:

***Breach of Contract***. The Counterclaim alleges that Jackson entered into an agreement to provide customary marketing and promotion services for the Film. They also allege that Jackson failed to do so (including by doing the opposite, trashing it), and that this failure harmed the Film's release. That is a textbook breach of contract claim. Jackson's arguments ignore the pleadings (in arguing that Claimants do not allege their own performance or an excuse for not performing), request the Court engage in premature contract interpretation (in arguing Claimants do not allege a breach), and disregard the lenient pleading standards (in arguing Claimants fail to allege damages). The breach of contract claim is more than adequately pled.

***Breach of the Implied Covenant***. The Counterclaims also provide sufficient factual basis to state a claim for breach of the implied covenant of good faith and fair dealing. Jackson's primary argument is that this claim is duplicative of the breach of contract claim. That is wrong. If Jackson is correct that the express terms of the contract do not forbid his disparagement of the Film, the implied covenant readily fills the gap. Disparagement, after all, directly frustrates the goals of a contract for promotional services. In any case, the implied covenant claim, while resting on the same facts, encompasses distinct legal theories, namely Jackson's purposeful bad faith in

attempting to frustrate the goals of the agreement and (if he had the discretion he contends) failure to use his discretion in a good faith manner. Finally, Rule 8(d), expressly allows pleading in the alternative. The implied covenant claim is, accordingly, not subject to dismissal.

***Intentional Interference with Contract***. The intentional interference with contractual relations claim is also well pled. The Counterclaims state that Jackson knew of the agreements with distributors, knew that the statements that he was going to "kill" the Film would interrupt those agreements, and that this was, in fact, the result. Jackson's argument that he did not intend to disrupt the agreements simply seeks to deny the allegations that state he was acting purposefully to destroy the Film and with full knowledge of the effect his actions would have. Jackson's argument that there was no actual breach or disruption of the at issue distribution agreements is similarly off base. The Counterclaims allege that a theatrical distribution agreement originally intended to cover thousands of screens was dropped to just a handful, killing the Film's box office prospects, and that the streaming distribution agreement was breached. At this stage, Claimants' allegations are more than sufficient to deny Jackson's Motion.

That said, if the Court found any of the counterclaims was missing necessary allegations (it should not), Jackson has offered nothing to support his statement that dismissal should be with prejudice. There is no assertion that amendment would prejudice Jackson. Moreover, nothing suggests that amendment would be futile. Thus, there is no basis for the Court to depart from the presumption that leave to amend should be granted.

***Third***, Jackson's anti-SLAPP motion is a masterclass in mischaracterization. As with the motion to dismiss, Jackson's reliance on evidence beyond the Counterclaims cannot salvage his motion. Jackson styles his anti-SLAPP motion as an attack on the pleadings. Mot. at 8. It is therefore subject to the same 12(b)(6) standard, as Jackson admits. If Jackson's motion requires considering outside materials, it cannot be granted as a matter of law, as the required discovery has not yet even begun.

The anti-SLAPP motion fails on the merits as well. Because Jackson seeks to strike the Counterclaim in its entirety, he must show that it is based *only* on protected conduct. Jackson cannot do so (nor does he even make an attempt). A significant portion of the Counterclaims stems

from Jackson's ***failure*** to provide the customary publicity that he promised. Well-established California law provides that ***failures*** to speak do not fall within the provision of the anti-SLAPP statute that Jackson invokes. As a result, the Court cannot award Jackson the only relief he seeks—the striking of the Counterclaims in whole. As California courts have recognized, making a facially overbroad anti-SLAPP motion and failing to address the proper standards for "mixed" causes of action justifies rejecting Jackson's anti-SLAPP motion ***and*** an award of fees ***against*** him.

Even if the Court were to reach the second stage of the anti-SLAPP analysis, Jackson's motion fails there too. As discussed, the relevant standard is the same as for a motion to dismiss. The Counterclaim survives Jackson's motion to dismiss. So it must also survive his anti-SLAPP motion. In any event, the Ninth Circuit has held that an anti-SLAPP motion cannot be used to deny Claimants the opportunity to amend afforded by the Federal Rules of Civil Procedure. Any dismissal, as discussed above, must be with leave to amend.

For this same reason, Jackson's premature and unsupported demand for fees falls flat. The fact that the anti-SLAPP motion fails at both steps makes the request irrelevant. But even if dismissal was granted (with leave to amend, as required), no fees could be awarded unless and until any amended complaint is found to also be deficient. *Jackson's Motion should be denied.*

## II. BACKGROUND

### A. Factual Background

#### 1. *Skill House and Curtis Jackson*

In 2022, producer Ryan Kavanaugh began work on the Film through two corporate entities—production company GenTV and Skill House Movie, the Film's corporate vehicle. Counterclaims ("CC") ¶¶ 13-14, 18. The Film offers a satirical message about the cost of fame and what influencers are willing to do to achieve it. *Id.* ¶ 20. This made the Film the perfect debut project for GenTV, which envisioned pairing famous influencers with established actors in projects designed to leverage the reach of their stars and appeal to a broad audience. *Id.*

Kavanaugh approached Jackson about a role in the Film. CC ¶ 21. Jackson touts himself as "one of the most recognized and admired artists and entrepreneurs in the world" with a "film and television empire." *Id.* ¶ 11. He also, however, "commands a large following and is extremely

active on social media." *Id.* In other words, Jackson represented both sides of the GenTV formula: an established actor ***and*** a famous influencer. *Id.* ¶¶ 11, 20.

Importantly, Kavanaugh had also successfully worked with Jackson before. CC ¶ 22. The year before, Kavanaugh engaged Jackson to provide commentary during a fight. *Id.* Kavanaugh had also been involved with the film *Den of Thieves* (2018). *Id.* With that film, Jackson showed his advertising and marketing prowess. *Id.* In part thanks to Jackson's commitment to the film's promotion, *Den of Thieves* grossed more than $80 million worldwide. *Id.*

### 2. *The Agreement*

After initial discussions between their representatives, Skill House Movie and Jackson (and G-Unit) reached the framework for a deal that included credit, payment, product placement, marketing and publicity services, and Jackson's appearance in the Film. CC ¶¶ 23-26. After further discussions, Skill House Movie prepared a binding term sheet and certificate of employment (collectively, the "Agreement") and shared them with Jackson's representatives. *Id.* ¶¶ 28–32 and Ex. A. When Jackson arrived on set to film his scenes, he executed the Agreement.[1] *Id.* ¶ 36. Among other provisions, the Agreement set out:

> 7. **<u>Marketing and Publicity</u>**: SHM [(Skill House Movie)] shall have the right to utilize CJ's [(Jackson's)] name, voice, approved likeness and approved biographical information in connection with the marketing and publicity of the Picture; provided that SHM shall have no right to utilize or exploit CJ's singing/rapping voice or music without CJ's prior writing approval. For purposes of clarity, CJ shall have the right to approve all marketing and publicity materials that utilize his name or likeness; once CJ's approval is secured, such materials may be utilized in any and all publicity and marketing campaigns without requiring CJ's further approval. ***CJ agrees to provide a customary amount of marketing and publicity services for the Picture (taking into consideration the size of CJ's role and his engagement as producer with a substantial profit participation) including but not limited to social marketing through CJ's personal social marketing channels*** with such services to be coordinated through Amanda Ruisi at AKR (amanda@akrpr.com) with each individual service subject to CJ's professional availability (i.e., ***CJ shall provide a customary amount of marketing and publicity services*** but each individual component shall be subject to CJ's professional availability).

CC ¶¶ 70, 80 and Ex. A at § 7 (emphases added).

---

[1] Even if Jackson did not sign the Agreement, which the Counterclaims allege he did, his words and actions show the existence of an implied in fact contract with the same material terms. *See* CC ¶¶ 68, 78; *see also id.* ¶¶ 25–30.

### 3. *Jackson's Performance and Attempted Renegotiation*

Jackson began performing on the Agreement even before he put pen to paper. CC ¶ 43. He had bottles of his liquor brands delivered to set so that they could be featured in the Film, as the Agreement required. *Id.* He also began posting about the Film on social media – going as far as to call the Film "my new movie" and noting that he, Kavanaugh, and the director, "aren't just changing the rules we're changing the game." *Id.*

After Jackson performed his scenes, however, he decided he wanted a larger portion of the Film's profits. *Id.* ¶ 38. In a move that foreshadowed his later conduct, he threatened that he would not promote the Film unless he was given additional compensation. *Id.* ¶¶ 38-39. Claimants negotiated a confidential side agreement to increase Jackson's backend share of the Film's profits, with the understanding that Jackson, as he had originally promised, would give the Film his full-throated promotion. *Id.* ¶¶ 38-42.

After the side agreement was drafted, and Jackson's attorney declared the agreement final, Jackson and his representatives acted consistently with the Agreement for years. CC ¶¶ 42, 44-48. Claimants would reach out about promotions and Jackson's PR team would either approve them or ask for changes. *Id.* ¶ 46. Jackson gave input and approval on the product placement of his liquor brands. *Id.* ¶ 47. The parties also communicated about release dates and merchandising. *Id.* ¶ 48.

### 4. *Jackson's Stops Providing Customary Publicity and Begins Disparaging the Film*

Unfortunately, Jackson's attitude toward the Film quickly and drastically shifted as the release approached. CC ¶ 52. He cut off all customary publicity. *Id.* For example, Claimants requested that Jackson, like the other stars, post about the release of the Film's initial minutes on GenTV's website. *Id.* Jackson refused.[2] *Id.*

Once the Film's release date was announced, Jackson escalated from simply withholding publicity. CC ¶¶ 52-54. Jackson began publicly disparaging the Film at the critical juncture leading up to its release. *Id.* ¶ 54. For example, Jackson took to social media to tell the Film's distributors, his followers, and the world at large that the Film was "going in the trash" and that he was going

[2] Though after the trailer went viral notwithstanding Jackson's failure to participate, Jackson's agent *still* sought to find a way to use that fact to promote Jackson. CC ¶ 52.

to "kill this movie." *Id.* ¶ 55. In a cruel twist, Jackson used the same post to promote his "50 Cent Action Channel" – a project he launched years ***after*** agreeing to appear in and promote the Film. *Id*. In other words, Jackson used his breach to market himself at the Film's expense. *Id.*

**5. *The Downstream Effects of Jackson's Breach***

Like any movie, there were a number of agreements in place related to the Film's exhibition and distribution. CC ¶ 49. Skill House Movie had an agreement with one of Fathom's affiliates for the Film to be shown in theaters throughout the United States and Canada. *Id.* ¶ 50. GenTV entered into an agreement with Group Black, Inc. that would have had the Film distributed through the NBC streaming service Peacock. *Id.* ¶ 51.

Jackson knew about both of these agreements. CC ¶ 88. His agents specifically referenced the Fathom deal. *Id*. Moreover, in arranging a screening of the Film, Jackson's representatives were told the Film could not be sent via link because of the NBC/Peacock deal. *Id*. Additionally, given Jackson's lengthy history in the entertainment industry and "film and television empire," Jackson knew that the Film would have distribution deals in place given the upcoming release. *Id*.

Jackson's efforts to tank the Film proved devastating to the distribution deals. Following Jackson's statements about killing and trashing the Film, Fathom drastically cut the number of screens on which the Film would be released kneecapping its theatrical revenue. CC ¶¶ 57, 96. Further, and in response to Jackson's threats, Group Black refused to pay the compensation it had promised for the streaming rights to the Film and did not place the film on Peacock. *Id.*

**B. Procedural History**

In yet another escalation, Jackson eventually brought the underlying Complaint in this action and sought a preliminary injunction blocking the Film's release. CC ¶¶ 62, 64. The Court rejected Jackson's bad faith attempt. *Id.* ¶¶ 63, 66. Then Claimants filed the Counterclaims seeking to hold Jackson accountable for the flagrant breach of his contractual commitments and malicious attempt to destroy the Film. *See generally id.*

## III. ARGUMENT

### A. The Applicable Legal Standard

Federal Rule of Civil Procedure 8 provides that a pleading need only include (1) "a short and plain statement of the claim showing that the pleader is entitled to relief;" (2) a demand for relief; and (3) a statement regarding the grounds for the court's jurisdiction. Fed. R. Civ. P. 8(a). This lenient requirement does not demand "detailed factual allegations," just something more than a "formulaic recitation of the elements of a cause of action." *Mendiondo v. Centinela Hosp. Medica Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted).

Given the lenient pleading standards—and as Jackson noted a few months ago—a "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." Dkt. 75 at 10 (quoting *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986)); *see also United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981) ("[I]t is only the extraordinary case in which dismissal is proper.") (cited by Jackson). To survive a motion to dismiss, the pleader simply need show that, when their factual allegations are accepted as true and all reasonable inferences are drawn in their favor, they have stated a plausible claim for relief. *Hunter v. Chatman*, 2018 WL 10076846, at *3 (C.D. Cal. Nov. 20, 2018). "Only where a plaintiff fails to nudge his or her claims across the line from conceivable to plausible, is the complaint properly dismissed." *MNE Trucking, Inc. v. OJ Com., LLC,* 2023 WL 9511164, at *1 (C.D. Cal. Dec. 28, 2023) (Vera, J.) (cleaned up).

California's "anti-SLAPP" law (Cal. Civ. Proc. Code § 425.16) does not change the minimal burden required to plead a claim in Federal Court. Rather, "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). Given the overlapping standard and because "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment," *Verizon Del., Inc. v. Covad Commc'ns Co.,* 377 F.3d 1081, 1091 (9th Cir. 2004), courts routinely consider an accompanying motion to dismiss before turning to the anti-SLAPP motion. *Ramachandran v. City of Los Altos,*

359 F. Supp. 3d 801, 820–21 (N.D. Cal. 2019); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1231 n.1 (N.D. Cal. 2014).

**B. Jackson Impermissibly Relies on Materials Outside the Pleadings, Which the Court Should Ignore**

Subject to limited exceptions, courts "may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The same is true of a pre-discovery anti-SLAPP motion. *Planned Parenthood*, 890 F.3d at 834 ("when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court."); *id.* at 835 (no error "in declining to evaluate the factual sufficiency of the complaint at the pleading stage" in response to anti-SLAPP motion).

Jackson does not contend that any of the limited exceptions allowing consideration of extrinsic materials apply here. *See generally* Mot. He also confirms that his anti-SLAPP motion is targeted at the pleadings, not the factual sufficiency of the Counterclaims. *See* Mot. at 8 ("If a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) …." (citation omitted)).[3] Yet throughout his Motion, Jackson expressly relies on items beyond the pleadings. *See, e.g.*, Mot. at 2, 17 ("Skill House Movie's own text messages confirm …."); *id.* at 3 (citing Dkt 22-1); *id.* at 5 (citing Dkt. 26-5 and Exs. 1 and 4); *id.* (citing Dkt. 93 (Defendants' Answer)); *id.* at 16 (citing Answer); *id.* at 18 (citing Dkt. 26-5, Exs. 1 and 4); *id.* at 21 (same). This is not the first time Jackson has done this. *See, e.g.*, Dkt. 81 (Sealed Order) at 7 (explaining information not cited in the FAC or contained in documents incorporated by reference was not properly before the Court). Jackon's reliance on evidence outside the Counterclaims is still impermissible. *See id.*; *Western Insurance Co. v. Frontier Homes, LLC*, 2018 WL 8220544, at *2 (C.D. Cal. Mar. 27, 2018) ("Because Defendants' arguments are mere denials of claims made in the Complaint, and they rely on facts outside of the Complaint and the attached exhibits, the

[3] During the meet and confer on Jackson's anticipated motion, his counsel confirmed their intention was to file a motion targeted at the legal sufficiency of the pleadings.

arguments are improper in a motion to dismiss."); *Ellertson v. City of Mesa*, 2016 WL 97538, at *6 (D. Ariz. Jan. 8, 2016) ("[T]o even make that argument Defendants would need to call on facts outside the pleadings thus the argument is not appropriate to a motion to dismiss.").

When faced with a motion to dismiss that relies on extrinsic materials, courts have two options. Fed. R. Civ. P. 12(d); *Grove v. Mead Sch. Dist. No. 354,* 753 F.2d 1528, 1532 (9th Cir. 1985). They can either reject the invitation to consider the improperly invoked materials or can convert the motion to dismiss to a motion for summary judgment under Federal Rule of Civil Procedure 56. *Id.* Conversion, however, requires "notice" and "an opportunity to respond" which "must include time for discovery necessary to develop facts justifying opposition to the motion." *Grove*, 753 F.2d at 1532–33.

Where, as here, the case is at an "early stage" and "no discovery has been conducted" conversion is "inappropriate." *Sommer v. United States,* 713 F. Supp. 2d 1191, 1204 (S.D. Cal. 2010); *Fed'l Deposit Ins. Corp. for Indymac Bank v. DHI Mortg. Co.*, 2010 WL 11578521, at *3 (C.D. Cal. Aug. 23, 2010) (rejecting conversion given "early stage in the proceedings and the little discovery that has been conducted"). Accordingly, the Court should refuse to consider the extrinsic materials Jackson cites and reject any arguments relying on these materials. *CelLink Corp. v. Manaflex LLC*, 2025 WL 1993517, at *6 (N.D. Cal. July 17, 2025) ("The Court declines to convert Defendants' motion to dismiss into a motion for summary judgment … and denies Defendants' motion to dismiss on this ground."); *Alipour v. U.S. Dep't of State,* 2024 WL 4867239, at *3 (C.D. Cal. Oct. 7, 2024) (rejecting arguments relying on facts outside pleadings).

### C. The Court Should Deny Jackson's Motion to Dismiss

Though Jackson's Motion first presents his arguments regarding anti-SLAPP, addressing the motion to dismiss first is more practical. If the claims are adequately pled and survive the motion to dismiss, the anti-SLAPP motion also fails. *Planned Parenthood*, 890 F.3d at 834. Moreover, as discussed, the anti-SLAPP motion does not supplant the Federal Rules' policy favoring liberal amendment. *Verizon Del., Inc.,* 377 F.3d at 1091. Thus the Court's determinations regarding the motion to dismiss are likely dispositive of Jackson's anti-SLAPP motion and, regardless, the anti-SLAPP motion may not need to be addressed. Accordingly, efficiency is served

by addressing the Motion to Dismiss first, as other courts have done. *See, e.g.*, *Ramachandran,* 359 F. Supp. 3d at 820–21; *Wynn*, 75 F. Supp. 3d at 1231 n.1.

Turning to the Motion to Dismiss, Jackson's arguments manage to do everything that is forbidden at this stage. They depend on information from outside the pleadings (as discussed above). They ignore alleged facts and draw every inference against, not for, the Claimants. *Garbini v. Protection One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002) ("All facts alleged in the complaint are taken to be true and construed in the light most favorable to the plaintiff."). And they seek to settle disputes of fact. *Id.* at 170-71 (fact intensive inquiries are "best left to trial or summary judgment, and not to a motion to dismiss"). Accordingly, Jackson's Motion should be denied.

#### 1. *The Breach of Contract Counterclaim is Well Plead*

To state a claim for breach of contract under California law, a plaintiff must allege (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff. *MNE Trucking, Inc.*, 2023 WL 9511164, at *1.

Skill House Movie's counterclaim alleges each of these elements. There is the agreement between Skill House Movie, Jackson, and G-Unit. CC ¶¶ 33, 68, Ex. A. Skill House Movie's performance. *Id.* ¶¶ 72-73. Jackson's breach. *See, e.g.*, *id.* ¶¶ 4-5, 7, 52, 54, 74. And damages suffered by Skill House Movie. *See id.* ¶¶ 58, 75. "This is all that is required under Rule 8(a)'s 'short and plain statement' standard." *MNE Trucking, Inc.*, 2023 WL 9511164, at *1. Despite these allegations, Jackson nevertheless contends that the breach of contract claim is subject to dismissal on several grounds. Jackson is wrong.

##### a. Skill House Movie Pleads its Performance or Excuse for Nonperformance

Jackson first argues that Skill House Movie failed to adequately plead its own performance under the Agreement. Mot. at 15-17. Specifically, Jackson contends that "Skill House Movie failed to perform—and breached first—by failing to pay Counter-Defendants their fixed compensation as required …." Mot. at 15. Jackson's argument require this Court to go beyond the pleadings, draw inferences against Skill House Movie, and ignore well established law. The Court should decline to do so.

Skill House Movie alleges that it "has paid the required fixed compensation to Jackson." CC ¶ 72. It further alleges that, while "Cross-Defendants have asserted Jackson did not receive payment of the fixed compensation until this year. Skill House Movie disputes this." *Id.* ¶ 73. That should be the end of the story. *See Sierra View Local Health Care District v. Influence Health, Inc.*, 2016 WL 2346799, at *5 (E.D. Cal. May 4, 2016) (allegation that pleader "performed all conditions and obligations required on its part to be performed…, except for those conditions and obligations excused" sufficient). Any other reading, impermissibly draws inferences against Claimants. *Garbini*, 49 F. App'x at 170 ("[H]ad the district court properly drawn all inferences in favor of plaintiffs, it could not have held that the complaint failed to establish" element); *Blockchain Innovation, LLC v. Franklin Resources, Inc.*, 2023 WL 2576314, at *10 (N.D. Cal. Mar. 20, 2023) ("Obviously, [defendant] vehemently disagrees with the facts pled in the complaint, but at this stage the Court must accept those facts as true and make all inferences in Plaintiff's favor.").

In arguing otherwise, Jackson attempts to mischaracterize a response in Skill House Movie's Answer. Mot. at 16. Once again, this impermissibly goes beyond the pleading. *Evox Prods., LLC v. Yahoo Inc.,* 2024 WL 629472, at *2 (C.D. Cal. Jan. 18, 2024) ("[T]he court does not consider the complaint or answer in a motion to dismiss counterclaims." (cleaned up)); *Finato v. Keith Fink & Assocs.,* 2017 WL 3075510, at *2 (C.D. Cal. May 17, 2017). Therefore, it must be disregarded. But in any event, the paragraph that Jackson cites simply says additional checks were sent in 2025, that paragraph, and the remaining statements in the Answer say ***nothing*** about whether the fixed compensation was first paid in 2022. *Compare* Dkt. 89 (Jackson Third Amended Complaint) ¶ 102 *with* Answer ¶ 102. The Answer denies Jackson's allegation to the contrary. *Id.* ¶ 64. The Counterclaim expressly rejects this contention. CC ¶ 83.

Even if the Court accepted Jackson's argument that the fixed compensation was only recently paid, that would still not be a basis to dismiss. A plaintiff can allege their performance ***or*** "excuse for nonperformance." *MNE Trucking, Inc.*, 2023 WL 9511164, at *1. The Counterclaims make clear that *even if* Jackson's payment was delayed, the timing condition has been waived (and that delay was caused by Jackson's failure to send an invoice that would allow payment to be remitted). CC ¶ 83. The parties continued to perform for a significant period *after* Jackson

supposedly failed to receive his required compensation. *See* CC ¶ 46 ("For the next couple of years, the parties acted consistently with the Agreement."); *id.* ¶¶ 44, 47-48. At a minimum, this creates a question of fact. *MAG Aerospace Indus., LLC v. Precise Aerospace Mfg.*, 2019 WL 6655398, at *5 (C.D. Cal. May 15, 2019) ("Where the injured party continues to perform and accepts further performance from the guilty party after the alleged breach, this constitutes a waiver of the breach."); *Goldberg v. BAC Home Loans Servicing, LP*, 2013 WL 4501014, at *3 n.2 (S.D. Cal. Aug. 21, 2013) (waiver is question of fact).

Jackson's cited case law does not demand a different conclusion. Take *eOnline Global, Inc. v. Google LLC*, 387 F. Supp. 3d 980 (N.D. Cal. 2019). That decision is on summary judgment and was based on a failure to produce evidence, it provides no insight as to whether the breach of contract claim is *adequately pled. Id.* at 985 ("Plaintiffs make no attempt to present…evidence that would create a genuine dispute of material fact…").

*Potovsky v. Lincoln Benefit Life*, 2023 WL 8461171 (N.D. Cal. Dec. 6, 2023) is similarly unavailing. The decision on waiver in that case rested on a long string of case law in the context of insurer defenses to coverage. *Id.* at *6-7. That context is far afield from the facts here. Moreover, that court distinguished another case where, as here, the claimant had "alleged facts sufficient to support its waiver theory among other theories of liability." *Id.* at *8 (internal quotation marks and citation omitted).

*Turner v. Real Time Resolutions, Inc.*, 2022 WL 14118935 (S.D. Cal. Oct. 24, 2022) also fails to help Jackson. In that case, the court found that the moving defendants were not even properly alleged to be parties to the contract. *Id.* at *4. It went on, in dicta, to note that the plaintiff failed to plead performance on a loan where the non-performance occurred before his excuse for not performing. *Id.* at *5. That is not the issue here. Notably, in *Turner* the claims were dismissed *with leave to amend*. *Id.* Thus, Jackson has no grounds to request dismissal with prejudice. *See U.S. Bank, N.A. for Registered Holders of ML-CFC Com. Mortg. Tr. 2007-7 v. Miller*, 2013 WL 12183652, at 4 n.34 (C.D. Cal. May 8, 2013) ("[A] plaintiff is not required to list all of his obligations under the contract, and specifically state that he performed each one," rather allegation

that party "fully performed . . . except those things excused, waived and/or made impossible" was sufficient to allege performance).

**b. Jackson's Breach is Alleged in the Counterclaims**

Jackson also contends that Skill House Movie fails to allege breach. Mot. at 17-19. Jackson is, once again, incorrect. The Agreement required Jackson to provide "a customary amount of marketing and publicity services for" the Film. CC ¶ 70, Ex. A § 7. The Counterclaims allege he did not do so and also publicly disparaged the Film. *See, e.g.*, *id.* ¶¶ 52, 54, 74. Rule 8 does not require anything more.[4] *See, e.g.*, *Ronpak, Inc. v. Electronics for Imaging, Inc.*, 2015 WL 179560, at *5 (N.D. Cal. Jan. 14, 2015) (allegations that defendant "failed to deliver functioning software" and had "failed to meet any of its obligations under the license agreement" sufficient to state a claim); *Sierra View*, 2016 WL 2346799, at *4-6 (description of "general nature of the plaintiff's alleged violations" and reference to specific contract provisions was enough to survive motion to dismiss counterclaims); *Kentwool Co. v. NetSuite Inc.*, 2015 WL 693552, at *7 (N.D. Cal. Feb. 8, 2015) (allegation that contract was breached "by supplying defective and non-functional Software, and/or failing to properly configure and implement functional software" sufficient).

In making his argument, Jackson asks the Court to delve into disputed questions of fact. He argues that the term "customary amount of publicity" is flexible enough to countenance his decision to stop promoting the Film at the critical junction of its impending release. Mot. at 17. But whether Jackson provided a "customary amount of publicity" and what meaning to give the term is, to use Jackson's own words, "a fact question not appropriate for a motion to dismiss." Dkt. 75 at 17 (citing *Vanguard Integrity Pros., Inc. v. Team Gordon, Inc.*, 2008 WL 11342701, at *2 (C.D. Cal. Apr. 4, 2008) ("Ambiguities in the language of a contract which cannot be resolved in the absence of extrinsic evidence, preclude a Motion to Dismiss.")); *Harvey v. Centene Mgmt. Co.*, 357 F. Supp. 3d 1073, 1085 (E.D. Wash. Nov. 21, 2018) ("It would be premature at the motion to dismiss stage for the Court to delve into contractual interpretation checking each term of the contract against each

---

[4] Jackson's footnote argument that the counterclaims do not "provide any notice" of the conduct at issue is unavailing. Mot. at 17 n.8. The Counterclaims allege Jackson did not do what was required, provide customary publicity, and instead opted to disparage the Film. *See, e.g.*, CC ¶¶ 4, 52-54. That is fair notice of the basis of the claims. *See Sierra View*, 2016 WL 2346799, at *4.

factual allegation in the complaint." (cleaned up)). So too is Jackson's attempted invocation of his "professional [un]availability" – which also rests on Jackson's improper invocation of extrinsic evidence. Mot. at 17-18; *Western Insurance Co.,* 2018 WL 8220544, at *2 ("Because Defendants' arguments are mere denials of claims made in the Complaint, and they rely on facts outside of the Complaint and the attached exhibits, the arguments are improper in a motion to dismiss."); *Ronpak, Inc.*, 2015 WL 179560, at *5 (rejecting arguments that defendants had complied with contract and that plaintiff was attempting to improperly import contract terms as "not well taken in a motion to dismiss"). Jackson's use of information absent from the Counterclaim, failure to acknowledge the allegations, and reliance inapposite legal authority is fatal.

**c. Skill House Movie Alleges Damages Against Jackson**

Jackson also briefly argues that Skill House Movie fails to allege that it suffered damages from Jackson's breach. *See* Mot. at 18. Not so. As Jackson knows, "a plaintiff need not plead contract damages with unusual specificity. Fairly rudimentary contract allegations satisfy Rule 8." Dkt. 75 at 17 (cleaned up) (quoting *Soil Retention Prods. v. Brentwood Indus.*, 582 F. Supp. 3d 725, 737 (S.D. Cal. 2022)). Skill House Movie alleges the harm it suffered as a result of Jackson's breach. CC ¶ 58 ("Jackson's disparagement of the Film—and failure to engage in customary publicity—also had a devastating effect on the Film's box office revenues, which would have been significantly greater had Jackson fulfilled his obligation to promote it."); *id.* ¶ 75 (damages includes revenues that would have been earned but for Jackson's conduct).

In arguing otherwise, Jackson strains allegations from the Counterclaims beyond their breaking point. He argues that the fact that the initial release of the Film's teaser trailer received over a million views in the first hour "affirmatively negates any damages theory." Mot. at 18. But Jackson has tens of millions of social media followers. CC ¶ 11. His massive following readily supports the allegation that the Film's box office "would have been significantly greater had Jackson fulfilled his obligation to promote it." *Id.* ¶ 58. Jackson's factual dispute about damages cannot be resolved on the pleadings. *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 93976, at *3 (N.D. Cal. Jan. 9, 2014) (allegation that "Plaintiff has been damaged and continues to be damaged in an amount to be proven at trial" sufficient).

In sum, the Counterclaims as pled state a claim for breach of contract.

**2. *The Implied Covenant Claim is Adequately Alleged***

"Every contract contains an implied-in-law covenant of good faith and fair dealing." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 965 (N.D. Cal. 2015). "The covenant is implied to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract." *Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 937–38 (9th Cir. 1999) (cleaned up).

Jackson argues that the implied covenant claim is fatally duplicative of the breach of contract claim and that his disparagement of the Film cannot constitute a breach of the covenant. Mot. at 19-22. Jackson is incorrect on both counts.

As an initial matter, the implied covenant and breach of contract claims are permissibly pled in the alternative. *Pacific Rollforming, LLC v. Trakloc North America, LLC*, 2010 WL 2523946, at *4 (S.D. Cal. June 18, 2010) (duplicativeness of contract and implied covenant claims "is not a sufficient reason for dismissal" as Rule 8(d) allows the claimant to "allege alternative and inconsistent claims for relief"); *Longest v. Green Tree Servicing, LLC*, 74 F. Supp. 3d 1289, 1301 n.5 (C.D. Cal. 2015) ("In any event…Federal Rule of Civil Procedure 8(d) entitles plaintiffs to plead claims in the alternative"). Jackon's reliance on *DCR Mktg. Inc. v. U.S. Alliance Grp*. 2020 WL 7084549 (C.D. Cal. Oct. 28, 2020) is misplaced. Mot. at 20. There, the Court said the plaintiff "cannot simultaneously argue that the agreement did not exist and that a breach of good faith occurred." *DCR Mktg.*, 2020 WL 7084549, at *5. Claimants do not argue there is no agreement.

Further, the implied covenant can be breached by "fail[ing] to perform a discretionary act in good faith." *Longest*, 74 F. Supp. 3d at 1300. It can also be breached where a party acts in bad faith to frustrate the contract's benefits. *Celador Intern. Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004). Accordingly, even where it is "based on the same facts" and "seek[s] the same remedy" as a contract claim, an implied contract claim is not necessarily duplicative. *Id.* at 853. The claimant simply needs to "distinguish [the] two claims based on the same facts." *Id.*

Here, the implied covenant offers separate and distinct legal theories under which Jackson can be liable for breach. *See Celador*, 347 F. Supp. 2d at 852-53 (noting that "[e]ven if Plaintiffs

are not ultimately successful on their breach of contract claim, they may still be able to prevail on their breach of the covenant of good faith and fair dealing claim" where "the fact finder could conclude that the actions of Defendants frustrated a benefit of the contract …."). Jackson contends that he was acting in his discretion in refusing to provide publicity for the Film. *See* Mot. 17-18, 20-21. But even if he was acting within the letter of the Agreement in exercising any discretion (and to be clear, Skill House Movie's first line argument is that he was not), the implied covenant nevertheless forbids him from using his discretion in bad faith. *Longest*, 74 F. Supp. 3d at 1300. The implied covenant similarly forbids Jackson from taking deliberate and bad faith action to frustrate the Agreement's benefits. *Celador*, 347 F. Supp. 2d at 852. Contrary to Jackson's contention, his bad faith is alleged throughout the Counterclaims, supporting both theories. *See, e.g.*, CC ¶ 4 (Jackson "decided to tank the Film" "turning his promotional obligations on their head"); *id.* ¶ 8 (referencing Jackson's bad faith); *id.* ¶ 9 ("Jackson's actions were willful, deliberate, and without remorse"); *id.* ¶ 52 (Jackson refused to promote release of first several minutes of film, but after it happened tried to figure out how to use film to promote himself); *id.* ¶ 59 (Jackson knew the harm his actions would have).[5]

Further, Jackson spouts a theory that disparaging a film one agrees to promote cannot breach the implied covenant. Mot. at 21-22. Such an argument flies in the face of the covenant's express purpose. *See Marsu*, 185 F.3d at 937-38 ("The covenant is implied to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract." (cleaned up)). It is obvious (or at least a question of fact) that disparaging the film directly contravenes the Agreement's purpose and frustrated Claimant's intended benefits. *See Stemmelin v. Matterport, Inc.*, 2022 WL 3226973, at *5 (N.D. Cal. Aug. 10, 2022) (denying ***summary judgment*** as further evidence was needed to determine whether conduct was contrary to contract's purposes and parties' expectations).

[5] *See also Pro-Com Prods., Inc. v. Kings Express LA, Inc.*, 2019 WL 1771652, at *4 (C.D. Cal. Feb. 21, 2019) ("Plaintiffs need not specifically allege legal theories in complaints, only the facts that could plausibly support them"); *Geiger v. Charter Communications, Inc.*, 2019 WL 4284502, at *2 (C.D. Cal. Jan. 23, 2019) ("[T]he fact that Plaintiffs did not plead the legal distinctions between their . . . theories as clearly as they could have does not doom that claim at the certification stage. After all, plaintiffs need not plead legal theories, only sufficient facts to support potential claims for relief.").

The cases Jackson cites do not say anything different. In *Jurin v. Google, Inc.*, 768 F. Supp. 2d 1064, 1073-74 (E.D. Cal. 2011), the defendant's conduct was expressly permitted by the agreement. *Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Assn.*, was decided on standing because it was not a party to the contract it sought to enforce through the implied covenant. 19 Cal. App. 5th 399, 426 (2018). Furthermore, *Guz v. Bechtel Nat. Inc.*, held that the implied covenant could not be used to convert an at-will employment arrangement into something more and its analysis focused on the employment context. 24 Cal. 4th 317, 349-350 (2000). Finally, in *Deerpoint Group, Inc. v. Agrigenix, LLC*, 393 F. Supp. 3d 968, 984 (E.D. Cal. 2019), the court simply found the implied covenant could not infer a duty to control third parties' disparagement or use of trade secrets into a settlement agreement, it has no bearing on whether Jackson, a party to the Agreement, could disparage the same thing he agreed to promote.

Claimant's implied covenant claim withstands Jackson's Motion.

### 3. *The Intentional Interference Claim Readily Survives Jackson's Motion to Dismiss*

Jackson spends considerably less time discussing the claim for intentional interference with contractual relations than he spends discussing a claim for "trade libel" that (as discussed below) has never been alleged by Claimants. For good reason. A claim for intentional interference with contractual relations requires (1) a contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) intentional acts designed to interfere with the contractual relationship; (4) breach or disruption of the contractual relationship; and (5) resulting damages. *United Tactical Systems, LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1010 (N.D. Cal. 2015). Each of these elements is alleged. *See, e.g.*, CC ¶¶ 5-6, 49-51, 59, 87-96.

Jackson's Motion disregards the allegations in the Counterclaims. First, Jackson argues that Claimants fail to allege that Jackson committed an intentional act designed to induce a breach or disrupt the distribution agreements. Mot. at 22-23. But the Counterclaim say exactly that. CC ¶ 5 (Jackson "threatened to kill the Film's premiere despite the fact that he had no right to do so. Moreover, he did so knowing the devastating effect his threats would have on the film"); *id.* ¶ 59 ("Jackson knew the harm his disparagement of the Film and threats to kill it would have" given his

experience in the entertainment industry); *id.* ¶ 89 ("Jackson began a campaign seeking to disrupt the Film's distribution deals"); *see also id.* ¶¶ 93-95. These pleadings readily distinguish this case from those Jackson cites.[6] Moreover, that interference may not have been Jackson's only (or even primary) motive is irrelevant. *See United Tactical Systems, LLC*, 143 F. Supp. 3d at 1010 (intentional interference with contract does not "require that the actor's primary purpose be disruption of the contract" (citation omitted)).

Jackson's only other argument is that Claimants failed to allege actual breach or disruption of the distribution agreements. But again, this ignores the pleadings. The Counterclaims allege that the theatrical distribution agreement provided for the Film to be shown at theaters throughout North America and that the parties contemplated the Film would be shown on thousands of screens, resulting in ticket revenue to Claimants. CC ¶¶ 6, 50, 87. The Counterclaims allege that the streaming distribution deal provided that the Film would made available to stream on Peacock and GenTV would be paid for those rights. CC ¶¶ 51, 87. The Counterclaims allege that these Agreements were breached (in the case of the streaming deal) and disrupted (in the case of the theatrical distribution deal). CC ¶¶ 6, 96. That states a claim. *See Precision Orthopedic Implants Inc v. Limacorporate S.P.A.*, 2016 WL 7378878, at *7 (C.D. Cal. Dec. 20, 2016) (contract was disrupted where it resulted in plaintiffs having fewer devices to sell and so made fewer sales); *Solyndra Residual Trust v. Suntech Power Holdings Co., Ltd*, 62 F. Supp. 3d 1027, 1048-49 (N.D. Cal. Mar. 31, 2014) (allegations that plaintiff had to reduce price of products to below what was previously agreed sufficient as express breach is unnecessary to state a claim under California law). Therefore, the intentional interference claim survives at this juncture.[7]

---

[6] *See, e.g.*, *Trinidade v. Reach Media Group, LLC*, 2013 WL 3977034, at *15-16 (N.D. Cal. 2013) (plaintiff failed to allege that defendant had knowledge of any specific contracts and no factual bases to indicate conduct would cause disruption, unlike here); *Song v. Telesair, Inc.*, 2025 WL 3139029, at *5 (C.D. Cal. Oct. 2025) (allegations of knowledge were conclusory and allegations about intent were nonexistent, unlike here).

[7] Jackson's statement that he "was simply exercising his free speech rights" is unsupported by any citation to the pleadings or a case law. *See Cathay Logistics, LLC v. Gerber Plumbing Fixtures, LLC*, 2016 WL 3912011, at *5 (C.D. Cal. July 19, 2016) (failure to describe legal theory was not enough to demonstrate how party could prevail on its affirmative defense and collecting cases).

**4. *There is No Claim for Trade Libel in the Counterclaims***

Perhaps anticipating that their arguments related to the claims alleged will fall short, Jackson spends a significant portion of his briefing arguing against a claim that is nowhere to be found in the Counterclaims. Jackson acknowledges this discrepancy. *See* Mot. at 11 (Cross-Claimants "do not actually assert a cause of action for disparagement."). Yet he then proceeds as if Claimants' use of the word "disparagement" in the Counterclaims means their claims are derivative of an underlying (and unstated) cause of action for trade libel. That's wrong. "Disparagement" is a word separate and apart from any association with a specific legal claim. *See* Disparage, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To speak slightingly of; to criticize (someone or something) in a way showing that one considers the subject of discussion neither good nor important."). None of the Counterclaims require a separate underlying tort. Nothing more needs to be said in defense of a claim that does not exist.

**D. Leave to Amend is Proper**

One need only look to Jackson's opposition to Claimants' motion to dismiss his First Amended Complaint for a thorough explanation as to why leave to amend would be warranted if any claim was not yet adequately alleged. Dkt. 75 at 19-20. As Jackson has acknowledged, leave to amend must be freely given. Fed. R. Civ. P. 15(a)(2); *Forman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given'"). The Ninth Circuit requires this policy "be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).

Despite his previous arguments and the lenient standard, Jackson's asks for dismissal of the Counterclaims with prejudice. Mot. at 25. Yet he gives no reason why such a dismissal would be appropriate. There is no claim of prejudice (or any other of the relevant factors), so, as Jackson has recognized, a "presumption" in favor of granting leave to amend applies. *Eminence Capital, LLC*, 316 F.3d at 1052. Moreover, there is no basis to conclude amendment would be futile. *Antablin*

*v. Motion Picture Costumers, Loc.#705,* 2021 WL 4732929, at *2 (C.D. Cal. July 6, 2021) ("Denial of leave to amend [for futility] is rare."). After all, futility applies only where "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). At this early juncture, before any discovery has commenced, that cannot be said. *See* Dkt. 75 at 20 and n.11.

That Jackson also brings an anti-SLAPP motion does not erase the Federal Rules' policy favoring amendment. The Ninth Circuit has expressly held the opposite. *Verizon Del., Inc. v. Covad Commc'ns, Co.,* 377 F.3d 1081, 1092 (9th Cir. 2004) ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").

### E. Jackson's Anti-SLAPP Motion Also Fails as a Matter of Law

#### 1. *Federal Law Does Not Endorse the Application of anti-SLAPP Provisions in Federal Court*

In one of its most recent anti-SLAPP decisions, the Ninth Circuit sitting en banc refused to give a full throated endorsement to the application of California's anti-SLAPP procedure in federal court, instead simply "assum[ing]" that it applied. *See Gopher Media LLC v. Melone*, 154 F.4th 696, 699 n.2 (9th Cir. 2025) (en banc). Since then, in *Berk v. Choy*, 607 U.S. __, 146 S.Ct. 546 (2026), a unanimous Supreme Court reemphasized that state law cannot so easily displace the Federal Rules. *Id.* at 553-54. In doing so, the Court rejected the defendant's attempt to rewrite the relevant law to square with federal court procedure. *Id.* at 555.

It is impossible to reconcile *Berk* with the Ninth Circuit's allowance of California anti-SLAPP motions in Federal Court. Accordingly, this Court should follow the Supreme Court's guidance. *Miller v. Gammie*, 335 F.3d 889, 893 ("[W]here the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority…."); *id.* at 900 (same rule applies to district courts). California's anti-SLAPP law directly conflicts with the Federal Rules of Civil Procedure, it accordingly cannot be applied in Federal Court—as other Circuits have held. *See Gopher Media*, 154 F.4th at 715 (Bress, J., concurring)

(collecting cases showing 5-1 circuit split); *Compare also Berk*, 146 S.Ct. at 560-61 (Jackson, J., concurring) ("Delaware's law . . . requires judges to account for a matter *outside the pleadings—i.e.,* the existence or sufficiency of an affidavit of merit (or lack thereof)—when deciding whether to dismiss a medical malpractice case. Rule 12(d), however, forbids such extraneous considerations. And Rule 12 is valid under the Rules Enabling Act…So Delaware's law cannot be enforced in federal court.") *with* Cal. Civ. Proc. Code § 425.16 ("In making its determination, the court shall consider the pleadings, ***and supporting and opposing affidavits***" (emphasis added)). The anti-SLAPP law cannot be re-written to come into compliance with the Federal Rules, as the Ninth Circuit has long attempted to do. *Berk*, 146 S.Ct. at 555; *Gopher Media*, 154 F.4th at 711–12 (Bress, J., concurring) (explaining changes Ninth Circuit has made to anti-SLAPP over time).

Jackson's anti-SLAPP motion should be rejected wholesale as inconsistent with the Federal Rules of Civil Procedure.

#### 2. *Even if the Court Chooses to Review Jackson's anti-SLAPP Motion, it Fails as a Matter of Law*

The analysis of an anti-SLAPP motion proceeds in two parts. *Hill v. Metro Goldwyn Mayer Studios Inc.*, 2024 WL 4801854, at *3 (C.D. Cal. Oct. 1, 2024) (Vera, J.). "The movant first must make a prima facie showing that the suit arises from an act in furtherance of the movant's rights of petition or free speech." *Id.* (cleaned up). "If the movant meets the initial threshold, the burden shifts to the claimant to demonstrate a probability of prevailing on the challenged claims." *Id.* (cleaned up). Before the opportunity for discovery, the second prong requires only showing that the pleadings survive the familiar 12(b)(6) standard. *Planned Parenthood*, 890 F.3d at 834.

Here, Jackson fails at step one as a significant portion of the claims do *not* rely on any protected conduct yet Jackson asks the Court to strike the Counterclaims wholesale, ignoring the remaining claims that have no relation to protected conduct. Regardless of step one, as discussed above, Jackson also fails at step two as the Counterclaims are adequately pled.

##### a. Step One: The Claims Do Not Arise Entirely From Protected Speech

While there are four categories of "protected acts" described in California's anti-SLAPP statute, Jackson argues the Counterclaims fall within only one – Section 425.16(e)(3), which covers

"written or oral statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. Proc. § 425.16(e); Mot. at 8. Jackson's entire argument revolves around "alleged statements on social media", completely disregarding the fact that a significant portion of the claims for breach of contract and breach of the implied covenant are not related to the social media posts.[8] *See* Mot. at 8.

Jackson's failure to provide the customary publicity required by the Agreement is alleged as part of the Counterclaims. *See, e.g.*, CC ¶¶ 74, 84. Yet "under the plain language of the anti-SLAPP statute, a *failure to speak* cannot fall in any of the first three categories, which protect only statements or writings, and not the failure to make them." *Callister v. James B. Church & Assocs.*, 108 Cal. App. 5th 185, 196 (2025) (cleaned up). Thus, the breach of contract and breach of implied covenant claims are "mixed" causes of action, (*i.e.* they contain some protected and non-protected acts) and they cannot be stricken in their entirety. *See Littlefield v. Littlefield,* 106 Cal. App. 5th 815, 825–27 (2024).

Yet striking the claims in their entirety is the <u>only</u> relief Jackson seeks. *See* Mot. at 25; Dkt. 98-1 (Proposed Order) ("[T]he Court hereby strikes Counter-Plaintiffs' Counterclaims in their entirety pursuant to California's anti-SLAPP statute…"). Jackson makes no effort in the Motion to separately address the distinct causes of action and he does not (and cannot) show that each cause of action is based solely on a protective activity. Accordingly, he has failed to meet his burden at step one of the anti-SLAPP analysis. *See Littlefield*, 106 Cal. App. 5th at 826 ("Appellants' motion…did not identify any 'particular allegations' of protected activity that they contended should be stricken. And since they did not show that the petition or any entire cause of action was based solely on protected activity, they did not show that the court could properly strike the petition or all of its causes of action—the only relief they sought."); *Park* , 93 Cal. App. 5th at 1108 ("Where a defendant moves to strike the entire complaint and fails to identify, with reasoned argument, specific claims for relief that are asserted to arise from protected activity, the defendant does not

[8] For purposes of this motion, Claimants do not dispute the social media posts fall within the anti-SLAPP's scope. Claimants, however, still prevail on step one of the anti-SLAPP analysis because, as discussed, Jackson does not seek to strike only those allegations. Regardless, Claimants also prevail on the second step as the claims are also well pled.

carry his or her first-step burden so long as the complaint presents at least one claim that does not arise from protected activity.”).

Jackson’s failure to even attempt to meet the burden necessary to justify striking mixed causes of action also justifies an award of attorneys’ fees against him. As the Court of Appeal recently explained regarding a similarly overbroad request:

> No straight-faced argument can be made for striking the entire petition or even any entire cause of action, each of which included claims for relief based on clearly unprotected activity…. [N]o reasonable attorney would conclude that the motion satisfied the rules that govern challenges to mixed causes of action. Appellants’ briefing did not even mention the relevant cases from the California Supreme Court.

*Littlefield*, 106 Cal. App. 5th at 829 (alteration adopted and internal quotations omitted). So too here. Jackson’s anti-SLAPP motion is facially overbroad and, by requesting the entire pleading be stricken, encompasses conduct that plainly does not fall within the purview of the statute. It is, accordingly, frivolous.

**b. Step Two: The Claims are Adequately Plead and Claimants Have a Likelihood of Prevailing on their Counterclaims**

As Jackson has not met his burden to show that Claimants’ challenged causes of action are based solely on protected activity, the Court need not proceed to the second step of the anti-SLAPP analysis. *Xu v. Huang*, 73 Cal. App. 5th 802, 812 (2021) (“If the [movant] fails to meet [their] burden on the first step, the court should deny the motion and need not address the second step.”). Yet, Claimants do so in an abundance of caution.

As Jackson acknowledges, where an anti-SLAPP motion is targeted at the pleadings and decided before the opportunity for discovery, the “motion must be treated in the same manner as a motion under Rule 12(b)(6).” *Planned Parenthood*, 890 F.3d at 834; Mot. at 8. Accordingly the question at step two, as it is for a Rule 12(b)(6) motion, is “whether a claim is properly stated.” *Id.* As discussed above, the claims survive Jackson’s 12(b)(6) motion. *See supra* §§ III.B-III.C. The contract claim is well pled. *Id.* § III.C.1. The implied covenant claim is well pled. *Id.* § III.C.2. And the intentional interference claim is well pled. *Id.* § III.C.3. Therefore, they survive the anti-SLAPP motion as well. *Planned Parenthood*, 890 F.3d at 834-35.

In any event, the anti-SLAPP motion should also be denied even if any claims are dismissed, as leave to amend is proper. *See Griffin v. Strauss*, 2023 WL 9687266, at *25 (C.D. Cal. July 3, 2023) ("Several federal District Courts in California have held that leave to amend leads to the denial [of] an Anti-SLAPP motion, reasoning that holding otherwise would undermine the federal policy that favors leave to amend" and collecting cases).

**F. Cross-Defendants Have No Claim to Fees, Even if the Claims are Dismissed**

As discussed above, there is no basis to strike or dismiss the Counterclaims. Accordingly, Jackson's premature request for attorneys' fees (made without any supporting documentation) within his Motion is irrelevant. Jackson also does not address the long line of cases in which courts have held that dismissal without prejudice does not entitle the movant to fees ***unless and until*** the claims are realleged and once again found to be lacking. *Verizon Del., Inc.*, 377 F.3d at 1091 ("***If*** the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants." (emphasis added)); *Ramachandran*, 359 F. Supp. 3d at 820 ("[B]ecause the Court is affording [claimant] leave to amend his state law claims … the Court will not decide whether defendants are entitled to attorneys' fees at this time, as an award of fees in this circumstance is likewise inconsistent with Rule 15's liberal amendment policy."); *Conlan v. Reilly*, No. 2:24-cv-03002, Dkt. 100 and 2025 WL 4058569, at *3 (C.D. Cal. May 16, 2025) (collecting cases). Therefore, an award of fees is not justified.

**IV. CONCLUSION**

For the foregoing reasons, Jackson's motion should be denied and the case should proceed.

Dated: March 5, 2026

Respectfully submitted,

LOEB & LOEB LLP

By:/s/ *Lauren J. Fried*
Lauren J. Fried

*Attorneys for Defendant* RYAN KAVANAUGH; *Defendants and Counter-Claimants* SKILL HOUSE MOVIE LLC, AND GENTV LLC

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this memorandum complies with the Court's Civil Standing Order (revised).

Dated: March 5, 2026

*/s/ Lauren J. Fried*
Lauren J. Fried