UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CURTIS JACKSON III et al.,

Plaintiffs,

v.

RYAN KAVANAUGH et al.,

Defendants.

Case No. 2:25-cv-03623-HDV-RAO

**ORDER DENYING PLAINTIFFS' MOTION TO DISMISS AND ANTI-SLAPP MOTION [98]**

1

## I.    INTRODUCTION

The Court has extensively summarized the facts of this case in previous orders.  In brief, Curtis Jackson III (professionally known as "50 Cent") appeared in the recent horror film *Skill House*, and now contends that never reached a binding contract regarding his participation.  The parties have already filed a cannonade of pleading motions and requests for injunctive relief.

Before the Court are two additional motions brought by Jackson and the other Plaintiffs challenging the Defendants' Cross-Complaint: (1) a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and (2) a motion to strike pursuant to California's Anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 (the "Motions").  [Dkt. 98].  Plaintiffs maintain that the Cross-Complaint fails to state a claim under the applicable pleading standards, and aver that Jackson's allegedly disparaging social media comments about the film and its producer constitute protected speech under California's ant-SLAPP statute.

For the reasons discussed below, the Motions are denied.

## II.    BACKGROUND

In the summer of 2022, Defendant and Cross-Claimant Ryan Kavanaugh ("Kavanaugh") approached Plaintiff Curtis J. Jackson ("Jackson"), a rapper, actor, producer, entrepreneur, and philanthropist professionally known as "50 Cent," about participating in the film *Skill House* (the "Film").  Third Amended Complaint ("TAC") ¶¶ 20, 23, 40 [Dkt. 89]; Cross-Complaint ("CC") ¶ 21 [Dkt. 93].  Kavanaugh is a producer of the film  and is the founder and owner of the corporate vehicle for the Film, Defendants Skill House Movie, LLC ("Skill House"), and the production company/producer GenTV, LLC ("GenTV").  CC ¶¶ 18, 13, 14; TAC ¶¶ 24, 27.  For a more fulsome recounting of the underlying facts, see this Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (filed Under Seal) [Dkt. 81], Order Denying Plaintiffs' Motion to Enforce Settlement Agreement (filed Under Seal) [Dkt. 76], Order Denying Motion to Compel Arbitration [Dkt. 69], and Order Denying Preliminary Injunction [Dkt. 41].

The additional allegations in the Cross-Complaint pertaining specifically to these Motions are as follows.  Prior to the Film's release, however, Jackson ceased his promotional services for the

Film and stopped engaging in customary publicity. Cross-Complaint ¶ 52. Jackson refused to post about the release of the Film's teaser and first several minutes on GenTV. *Id.*

After initially withholding customary publicity, Jackson purportedly began to publicly disparage the Film. *Id.* ¶ 54. On April 17, 2025, Jackson posted comments about the Film on his public Instagram account, stating: "This guy Ryan Kavanaugh is doing everything in his power to make me kill this movie. This one is going in the trash []CAN! @50centaction." *Id.* ¶¶ 55, 90. During this same period before the Film's release, Jackson posted old articles about Kavanaugh, adding: "Here he is guys [] he must be drunk right now fucking wit me. [] Top Financier get the fuck outta here. @50centaction @bransoncongac @lechminduroi." *Id.* ¶ 56.

After these posts, the distributor of the Film cut the number of theaters for the Film's opening weekend. *Id.* ¶ 57. Negotiations with foreign distributors were cut off, and the streaming partner for the Film canceled the agreement for the Film to appear on Peacock. *Id.* Defendants allege that Jackson knew that his social media posts disparaging the Film would be seen by millions of his followers. *Id.* ¶ 60.[1]

On January 20, 2026, Defendants and Counter-Claimants Skill House and GenTV filed a Cross-Complaint against Plaintiffs alleging three counterclaims for: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) intentional interference with contractual relations. Cross-Complaint ¶¶ 67–96.[2] Cross-Defendants now move to strike pursuant to the California Anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, and to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [Dkt. 98]. The Motions are fully briefed and were taken under submission without oral argument.

---

[1] At the time Jackson filed the underlying complaint, he claimed he had "35.6 million followers on Instagram, 42 million followers on Facebook, 12.8 million followers on X (formerly Twitter), and 8.3 million followers on TikTok." *Id.* Jackson uses these same platforms to promote his film and television projects. *Id.*

[2] Count one is alleged by Skill House against Jackson and G-Unit. [Dkt. 98 at 46]. Count two is alleged by Skill House against Jackson and G-Unit. *Id.* at 48. Count three is alleged by Skill House and GenTV against Jackson. *Id.* at 50.

3

## III.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Only where a plaintiff fails to "nudge[] [their] claims . . . across the line from conceivable to plausible" is the complaint properly dismissed. *Id.* at 680.

While the plausibility requirement is not a probability assessment, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Determining whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making this determination, allegations of material fact should be construed in the light most favorable to the plaintiff. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) (citation omitted).

When alleging fraud, the party must meet the higher pleading standard imposed by Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b) (requiring parties to "state with particularity the circumstances constituting fraud or mistake"). "To properly plead fraud with particularity under Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged." *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018)). "While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (citation omitted).

### B.    California Anti-SLAPP Statute Cal. Civ. Proc. Code § 425.16

California law recognizes that a certain type of lawsuit, claim, or counterclaim— specifically, a "strategic lawsuit against public participation," or "SLAPP"—is often filed for the

4

improper purpose of "chill[ing] the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  Cal. Civ. Proc. Code § 425.16(a); *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 59 (Cal. 2002).  To guard against these pernicious suits or claims, the California Code of Civil Procedure provides an "anti-SLAPP" mechanism whereby a litigant can bring a special motion to strike any cause of action (or, as here, a counterclaim) "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  Cal. Civ. Proc. Code § 425.16(b)(1).

California Code of Civil Procedure Section 425.16 establishes a two-step process for determining whether a claim falls under the anti-SLAPP statute.  The court must first determine if the party bringing the anti-SLAPP challenge has made a prima facie showing that the cause of action at issue arises from protected activity.  *Navellier v. Sletten,* 29 Cal. 4th 82, 88 (2002) (citing § 425.16, subd. (b)(1)).  "A defendant meets this burden by demonstrating that the act underlying the cause fits one of the categories spelled out in section 425.16, subdivision (e)." *Braun v. Chronicle Publishing Co.,* 52 Cal. App. 4th 1036, 1043 (1997).  If the court finds that this showing has been established, it must then "determine whether the plaintiff[3] has demonstrated a probability of prevailing on the claim." *Navellier*, 29 Cal. 4th at 88 (citing § 425.16, subd. (b)(1)).

To show a probability of prevailing under Section 425.16, subd. (b)(1), the responding party must have "stated and substantiated a legally sufficient claim." *Briggs v. Eden Council for Hope & Opportunity,* 19 Cal. 4th 1106, 1123 (1999).  In other words, the respondent to the anti-

---

[3] The quotations from *Braun* and *Navellier* cited above use the terms "defendant" and "plaintiff" to refer to the party bringing the anti-SLAPP challenge (i.e., the "defendant" against whom the problematic cause of action is asserted) and the party bringing the initial claim or counterclaim under analysis (the "plaintiff").  Here, however, since the anti-SLAPP motion is brought against a **counterclaim**, the terms are reversed.  The initial *prima facie* showing must be made by Jackson and the Counter-Defendants, and the "probability of prevailing" burden is on Defendant Skill House and Counter-Claimants asserting the counterclaims.

SLAPP motion "must demonstrate that the [pleading] is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Wilson v. Parker, Covert & Chidester,* 28 Cal. 4th 811, 821 (2002) (quoting *Matson v. Dvorak,* 40 Cal. App. 4th 539, 548 (1995). Finally, "[o]nly a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." *Navellier*, 29 Cal. 4th at 88.

## IV.    DISCUSSION

### A.    Motion to Dismiss[4]

#### 1.    Breach of contract

Skill House's first counterclaim alleges breach of contract against Jackson and G-Unit.[5] Cross-Complaint ¶¶ 67-75. Under California law, a claim for breach of contract requires: (1) a

---

[4] The Court considers the motion to dismiss before reviewing the accompanying anti-SLAPP Motion to Strike pursuant to California Code of Civil Procedure Section 425.16. This is proper because "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004). Moreover, it is well-settled that "[i]f the claim is not adequately stated in the operative complaint, the district court may defer consideration of the anti-SLAPP motion pending the filing of an amended complaint." *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 811 (N.D. Cal. 2019) (citing *Verizon Delaware, Inc.*, 377 F.3d at 1091–92 (holding district court did not err in deferring consideration of [defendant's] anti-SLAPP motion pending receipt of [plaintiff's] first amended complaint, and affirming denial of anti-SLAPP motion to strike first amended complaint)); *Art of Living Found. v. Does*, No. 10-CV-05022-LHK, 2011 WL 2441898, at *9 (N.D. Cal. June 15, 2011) (finding that striking plaintiff's initial complaint where leave to amend was not clearly futile would directly collide with Rule 15's liberal amendment policy). "[T]he purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served if plaintiffs eliminated the offending claims from their original complaint. If the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants." *Verizon Delaware, Inc.*, 377 F.3d at 1091.

[5] Both parties have argued—at various stages during these proceedings—that either an underlying contract *does* or *does not* exist. Although this issue is likely to ultimately be dispositive, for purposes of this Motion only the Court will not belabor its analysis, as it is not the gravamen of the current argumentation by the parties.

contract, (2) performance or excuse for nonperformance, (3) breach, and (4) damages. *Coles v. Glaser*, 2 Cal. App. 5th 384, 391 (2016)).

Plaintiffs move to dismiss the breach of contract counterclaim on three separate grounds.

First, Plaintiffs contend that Skill House fails to plead the element of performance because it purportedly breached the contract first by failing to pay as required. Motion at 15–16. The Agreement states that "SHM [Skill House] shall pay to Employer [G-Unit, Jackson's company, on behalf of Jackson] on a pay-or-play basis fixed compensation of $100,000 payable within five (5) business days from completion of the services set forth in Paragraph 1 above." *Id.* at 16 (citing Cross-Complaint, Ex. A ¶ 4). According to Plaintiffs, Skill House did not pay G-Unit until June 3, 2025, nearly three years after it was due. *Id.* (citing Answer ¶ 102 [Dkt. 93]).

But that argument is misplaced at this pleading stage, where the Court must accept all plausible allegations. Here, Skill House "disputes" Plaintiffs' assertion regarding the timing of payment, Cross-Complaint ¶ 73, and alleges that it "has paid the required fixed income to Jackson, credited him as required, and placed his products in the Film." *Id.* ¶ 72. Moreover, as Skill House correctly points out, the parties continued to perform for several years, thus raising potential issues concerning waiver of the timing requirement. *See id.* ¶¶ 44, 46–48, 73; *cf. MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*, 5:18-cv-01096-RGK, 2019 WL 6655398, at *5 (C.D. Cal. May 15, 2019) ("Where the injured party continues to perform and accepts further performance from the guilty party after the alleged breach, this constitutes a waiver of the breach."). In short, courts are loathe to dismiss these claims at the pleading stage where—as here—doing so would depends on a multitude of facts not yet developed in the record. *See Blockchain Innovation, LLC v. Franklin Resources, Inc.*, No. 21-cv-08787–HSG, 2023 WL 2576314, * 10 (N.D. Cal. Mar. 20, 2023) ("Obviously, [defendant] vehemently disagrees with the facts pled in the complaint, but at this stage the Court must accept those facts as true and make all inferences in Plaintiff's favor. At this stage, the claim is adequately pled."); *see also Vanguard*, 2008 WL 11342701 at *2 ("[A]t this stage in the proceedings [the Court must] strive to resolve any contractual ambiguities in the [non-moving party's] favor.") (citation omitted).

Second, Plaintiffs maintain that the allegations of breach are insufficient as a matter of law because the "customary amount" of required publicity was "subject to CJ's professional availability" and therefore "inherently flexible and undefined." Motion at 17 (citing Cross-Complaint ¶ 80; *id.*, Ex. A ¶ 7). Jackson urges the Court to adopt the interpretation that the contract does not require "any specific marketing activity such as social media posts about a particular event." *Id.*

The Court disagrees that any interpretation of these contractual terms is necessarily compelled at this stage. Moreover, Defendants allege that Jackson not only "[f]ail[ed] to provide the customary amount of publicity services for Skill House," but that Jackson "[p]ublicly disparage[ed] the Film in breach of his agreement to promote the Film, not damage it." *Id.* 74a.–b. These allegations are detailed, put Plaintiffs on ample notice of the precise nature of the counterclaim, and are sufficient to state a claim under Rules 8 and 12(b)(6).[6] *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 555 (Under Rule 8(a), the plaintiff must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." While "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," it requires more than "a formulaic recitation of the elements of a cause of action.") (citation omitted).

Lastly, Jackson contends that Plaintiffs' damages theory is "fatally speculative," and fails to allege resulting damages necessary to support a claim for breach of contract. Motion at 18; Reply at 3. Not so. Skill House alleges that "Jackson's disparagement of the Film—and failure to engage in customary publicity—also had a devastating effect on the Film's box office revenues, which would have been significantly greater had Jackson fulfilled his obligation to promote it." Cross-Complaint ¶ 58. Skill House further alleges that its "damages include revenues from the Film that would have been earned but for Cross-Defendants' conduct." *Id.* ¶ 75. That the Film's teaser may have received

---

[6] Skill House goes beyond these assertions and alleges the specific content of the disparaging statements. For instance, Skill House alleges that Jackson posted negative comments about the Film on social media, saying: "This guy Ryan Kavanaugh is doing everything in his power to make me kill this movie. This one is going in the trash []CAN! @50centaction," Cross-Complaint ¶¶ 55, 90, and captioning a post about Kavanaugh: "Here he is guys [] he must be drunk right now fucking wit me. [] Top Financier get the fuck outta here." *Id.* ¶ 56.

8

over a million views in the first hour does not negate Plaintiffs' damages theory as a matter of law. Moreover, Plaintiffs allege that because "Jackson commands a large following and is extremely active on social media,"[7] the Film's box office revenues "would have been significantly greater had Jackson fulfilled his obligation to promote it." Cross-Complaint ¶¶ 11, 58. That is more than enough to plead damages. *Cf. Jobscience, Inc. v. CVPartners, Inc.*, No. 3:13–cv–04519–WHA, 2014 WL 93976, at *3 (N.D. Cal. Jan. 9, 2014) (allegations that, due to the alleged breach of contract, plaintiff was damaged and continues to be damaged in an amount to be proven at trial considered sufficient to survive motion to dismiss).

### 2. Implied covenant of good faith and fair dealing

Next, Jackson contends that Plaintiffs' implied covenant counterclaim should be dismissed because it is duplicative of the breach of contract claim. Motion at 19–20. Skill House counters that, as the implied covenant claim is pled in the alterative to the breach of contract claim, it is not duplicative. Opposition at 24. Despite this alternative pleading, Jackson maintains that the implied covenant claim is superfluous as it alleges the same factual predicates as the breach of contract claim. Motion at 20.

Allegations for breach of the implied covenant must demonstrate "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). To successfully plead breach of the covenant, the allegations must "unfairly frustrate the agreement's common purpose and deprive the other party of the contract's benefits." *DCR Marketing Inc. v. U.S. Alliance Group, Inc.*, No. 19-cv-1897–JVS, 2020 WL 7084549, at *5 (C.D. Cal. Oct. 28, 2020).

---

[7] Skill House alleges that "Jackson has around 35.7 million followers on Instagram, 42 million followers on Facebook, 12.8 million followers on X (formerly Twitter), and 8.4 million followers on TikTok." CC ¶ 11.

But if a claim for breach of the implied covenant merely restates the claim for breach of contract, it is superfluous and subject to dismissal. *Id.* (citation omitted).  Moreover, "[i]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau*, 222 Cal. App. at 1395.  An exception to this general rule exists "where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits."  *Celador Intern Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004).

Here, Plaintiffs have adequately distinguished their claims and provide distinct legal theories as to each.  They allege that Jackson's actions breached the contract and, alternatively, that his "actions, allegedly taken in bad faith, frustrated the *actual* benefits of the contract."  *Id.* (citing *Lamke v. Sunstate Equipment Co., LLC*, 387 F. Supp. 2d 1044, 1048 (N.D. Cal. 2004) (court allowed leave to amend to make this distinction)).  Stated differently, even if Jackson were deemed to have complied technically with the terms of the Agreement due to his ability to exercise discretion in promoting the Film, the implied covenant counterclaim here is predicated on the theory that he deliberately frustrated the benefits of the contract.  Specifically, Skill House alleges, *inter alia*, that Jackson "decided to tank the Film only weeks before its theatrical release and without any prior warning, turning his promotional obligations on their head," Cross-Complaint ¶ 4, "gave no thought to the many who were harmed by his conduct . . . [and] he readily abandoned his pre-existing obligations. Jackson's actions were willful, deliberate, and without remorse," *id.* ¶ 9, "Jackson refused to post about [the teaser]," and "knew the harm his disparagement . . . would have."  *Id.* ¶ 59.  As pled, the implied covenant claim is neither superfluous nor duplicative.[8]                   .

---

[8] Jackson further avers that disparaging the Film does not constitute a breach of the implied covenant because the Agreement does not contain a non-disparagement provision.  Motion at 18, 21.  Yet, inherent in an agreement to promote the Film is its corollary, namely, an obligation not to disparage the very thing one has assented to endorse.  Even if the Agreement granted Jackson the discretion not to engage in certain publicity and marketing engagements, it did not grant him carte blanche to post negative, disparaging, and ultimately damaging material about the Film and its

### 3. Intentional interference claim

Finally, Jackson contends that Skill House fails to allege a counterclaim for intentional interference with contractual relations.  To state such a claim under California law, a plaintiff must plead "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *United Tactical Systems, LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1010 (N.D. Cal. 2015).

According to Jackson, Skill House's intentional interference claim fails because it does not adequately allege that Jackson "committed an intentional act designed to induce a breach or disrupt the contract between Skill House and Fathom for theatrical distribution and the contract between GenTV and Group Black for streaming distribution."

The Court is unconvinced.  Skill House specifically alleges that Jackson *did* intentionally act to induce a breach or disrupt the distribution agreements between Skill House and Fathom as well as between GenTV and Group Black.  *See* Cross-Complaint ¶ 5 (Jackson "threatened to kill the Film's premiere" and "did so knowing the devastating effect his threats would have on the film"); *id.* ¶ 59 ("Jackson is an experienced player in the entertainment industry" and "knew the harm his disparagement of the Film and threats to kill it would have,"); *id.* ¶¶ 89, 93–95 ("Jackson began a campaign seeking to disrupt the Film's distribution deals.").  Regardless, Jackson's primary intent need not be disruption of the contract.  *United Tactical Systems*, 143 F. Supp. 3d at 1010-11 (for intentional interference, "it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself, nor does [it] require that the actor's primary purpose be disruption of the contract.") (citation omitted).  Skill House has sufficiently pled an intentional interference claim.

### B.    California Anti-SLAPP Provision § 425.16

---

producers.  Such an interpretation nullifies the purpose of the Agreement, frustrates its intended benefits, and is the epitome of bad faith.  *See Celador*, 347 F. Supp. 2d at 852

11

Plaintiffs contend that Defendants' Counterclaims should be dismissed under Section 425.16, California's anti-SLAPP provision, because they attempt to suppress and chill Jackson's conduct in furtherance of his constitutional right to free speech. Motion at 7. Under the first step of the anti-SLAPP analysis, Plaintiffs bear the initial burden of making a *prima facie* showing that Defendants' Counterclaims arise from Jackson's free speech or petition activity. *See Jordan-Benel*, 859 F.3d at 1188; *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013); *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007). Specifically, Plaintiffs must show that the conduct "aris[es] from" the person's right of free speech, and that the speech is made in "connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1).[9]

The first element is met here. Pursuant to Section 425.16(e)(3), speech is protected that is made in "a public forum in connection with an issue of public interest."[10] The Counterclaims allege that Jackson's statements were made on social media platforms and accessible to the public, and thus were made in a "public forum." *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1252 (2017) (for

---

[9] Section 425.16(b)(1) provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. Cal. Civ. Proc. Code § 425.16(b)(1).

[10] An 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. Cal. Civ. Proc. Code § 425.16(e).

purposes of the anti-SLAPP statute, websites accessible to the public, such as Facebook and Instagram, are public forums.).

While the contours of the "public interest" test have not been definitively determined by the Ninth Circuit, the anti-SLAPP provision generally and the concept of "public interest" specifically are construed broadly. *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) ("[C]ourts are directed to 'construe[ ]' the anti-SLAPP statute 'broadly.'") (citation omitted); *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 n.3 (9th Cir. 2017) ("California defines an issue of public interest broadly.")  Under a broad interpretation, the statements, which pertain to the release of a movie, were arguably made in connection with an issue of public interest.  Counter-claims ¶¶ 5–6, 13, 19–20, 45, 52, 54–56, 60; *See Tubbs v. Paramount Pictures* Corporation, No. CV 24-1417-GW-BFMx, 2024 WL 6943323, at *7 (C.D. Cal. June 28, 2024) ("[T]he Ninth Circuit at least *suggested* that it would *agree* that state-law claims 'involving television' – or, presumably, movies – would satisfy the first step of the anti-SLAPP analysis/test.") (emphasis in original).

But in addition to the alleged disparaging statements made by Jackson, Skill House also alleges—as integral to the Counterclaims—that Jackson failed to provide the customary publicity as required under the Agreement.  *See, e.g.*, Counter-claims ¶¶ 74, 84.  Thus, because the Counterclaims involve *mixed* causes of action—*i.e.*, claims predicated on both protected acts (*viz.*, the purportedly disparaging statements on social media), and some non-protected acts (*viz.*, the failure to promote the Film via social media or otherwise)—striking the claims completely is not warranted under California law. *Littlefield v. Littlefield*, 106 Cal. App. 5th 815, 825 (2024) (in case of mixed allegations, "since [Appellant's] did not show that the petition or any entire cause of action was based *solely* on protected activity, they did not show that the court could properly strike the petition or all of its causes of action.") (emphasis added).  Here, because Plaintiffs seek to strike the Counterclaims in their entirety, *see* Motion at 25; Dkt. 98-1, without distinguishing between the protected and unprotected activity, Plaintiffs fail to meet the first step of the anti-SLAPP inquiry.

Were the Plaintiffs to satisfy this initial prong—which they manifestly do not—the burden would then shift to Defendants to show "a probability that [they] will prevail on the claim."[11] § 425.16(b)(3). Here, Plaintiffs mount a "facial" challenge to the legal sufficiency of the Counterclaims. Motion at 2–3. Such motions require a court to apply the same Rule 12 benchmark applied in pleading motions. *See Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (when anti-SLAPP motion challenges a claim's legal sufficiency, "a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated.").

Again, Plaintiffs fail to meet this standard. Because the Court has determined that Skill House has adequately pled the Counterclaims pursuant to Rule 12(b)(6), *see* discussion *supra*, the claims survive scrutiny under the second prong of the anti-SLAPP analysis. The Plaintiffs' anti-SLAPP motion is therefore without merit.

## V. CONCLUSION

For the reasons discussed above, the Motion is denied.

Dated: June 5, 2026

_____
Hernán D. Vera
United States District Judge

---

[11] *Xu v. Huang*, 73 Cal. App. 5th 802, 812 (2021) ("If the defendant fails to meet his or her burden on the first step, the court should deny the motion and need not address the second step.").